FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2012 MAR -9 PM 12: 04
GREGORY C. LANGHAM
CLERK
BY ________ DEP. CLK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. '12 - CV - 00603
(To be supplied by the court)

[illegible], Plaintiff,

v.

________________,

Colorado Coalition For The Homeless,

________________,

________________,

________________,

________________,

________________,

________________, Defendant(s).

(List each named defendant on a separate line.)

---

**COMPLAINT**

---

Negligence in the non-performance of Defendants fiduciary responsibilities to have notified Plaintiff of receipt of notice to quit [see attached] or to have made any efforts as Plaintiff's payee to salvage any of Plaintiff's apartment furnishings, belongings, computer, large screen T.V. et al!! [illegible]

(Rev. 07/06)

**PARTIES**

1. Plaintiff [illegible] is a citizen of U.S.A. who presently resides at the following address: 1746 Emerson Street #203, Denver, Co. 80218

2. Defendant John Parvensky / Colorado Coalition for the Homeless is a citizen of U.S.A. who live(s) at or is/are located at the following address: 2111 Champa Street, Denver, Co. 80205

3. Defendant ________ is a citizen of ________ who live(s) at or is/are located at the following address:

(Attach a separate page, if necessary, to list additional parties.)

**JURISDICTION**

4. Jurisdiction is asserted pursuant to following statutory authorities: That Defendant is listed with the Colorado Secretary of State as a non-profit Corp. & John Parvensky as Registered Agent.

5. Briefly state the background of your case: That Defendant denied knowledge of receipt of eviction proceedings [Notice to Quit], copy attached, denied any responsibility to have saved any of Plaintiff's apartment belongings! Allowed same to be sold by Landlord Vida LLC / Residential Niche and further refused to give to Plaintiff [under subsidy] copy of lease between respective parties Landlord / Residential Niche / Vida LLC

for over 1 year from date of Plaintiff's original request resulting in the total loss of

**FIRST CLAIM FOR RELIEF**
**AND SUPPORTING FACTUAL ALLEGATIONS**
(Please number your paragraphs and attach any necessary additional pages.)

1) Negligence:

In Defendants negligent refusal to acknowledge attached copy of Notice to quit / wrongful eviction and Fiduciary mismanagement of Plaintiff's Social Security Monies acting as Plaintiff's payee, plaintiff's total apt. belongings were sold at Sheriff's sale as Defendant failed to respond in a proper fiduciary manner in spite of Defendants responsibility to have done so to save all of plaintiff's apt. furnishings / belongings all lost at Sheriff's sale at the instruction of Residential Stable / Vida LLC's proper eviction proceeding to Defendant, Colorado Coalition for the Homeless whose negligence caused the un-necessary loss of all of plaintiff's property!!

**SECOND CLAIM FOR RELIEF**
**AND SUPPORTING FACTUAL ALLEGATIONS**
(Please number your paragraphs and attach any necessary additional pages.)

2) Pain & Suffering

As a direct result of the neglect perpetrated by Defendants Plaintiff was subjected to pain and suffering as a result of having all retirement furnishings sold at Sheriff's sale causing plaintiff to sleep in the Greyhound bus terminal at temperatures of 15 degrees below zero for the several months it took Defendant to find a place to live and eat!

Plaintiff prays the court to render judgment for an additional $25,000.00 for the pain and suffering resulting from the Colorado Coalition's Fiduciary neglect in causing this unnecessary additional suffering!

## THIRD CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
(Please number your paragraphs and attach any necessary additional pages.)

## REQUEST FOR RELIEF

Plaintiff requests the following relief:

That as a result of Defendants negligence, plaintiff be awarded Judgement in the amount of $80,000.00 as restitution to replace all of Plaintiff's total loss of property as a result of Defendants complete negligence, lack of Fiduciary responsibility as Plaintiff's payee and subsequent attempted cover up [illegible] not making lease to

Date: 2/24/2012

[illegible]
(Plaintiff's Original Signature)

7746 Emerson St. #103
(Street Address)

Denver Co. 8021[illegible]
(City, State, ZIP)

720-209-0293
(Telephone Number)

Plaintiff for over 1 year [illegible] request!! That plaintiff's total [illegible] property were as a result of Defendants refusal to acknowledge receipt of Landlords "notice to quit" and subsequent failure of Defendant to perform in its Fiduciary capacity to save Plaintiff's belongings [illegible]

# NOTICE TO QUIT
(Please Type or Print Legibly)

To: Burton Sandles

Pursuant to §13-40-107, C.R.S., you are hereby notified by the undersigned owner that your tenancy of the land and premises described below is terminated as of 01/16/2009 (date) at 3:00 p.m. (time) and you are accordingly notified to vacate said premises and surrender possession thereof on or before said date and time.

Street Address 1151 Colorado Blvd. #108
City Denver County Denver
Subdivision Lot Block

The grounds for termination are as follows: Severe assault on staff and destruction of company property as described in Denver police report, case # 201018256 on record with the Denver county sheriff dept on 01/12/2010.

Date: 01/12/2010

J Schuh
Landlord/Owner

By: J. Schuh
Landlord/Owner's Agent or Attorney Tiana Schuh

## CERTIFICATE OF SERVICE

I hereby certify that I served this Notice to Quit on 1/12/10 (date) in Denver (County), Colorado by my selection below:

☐ By leaving a true copy with ________ (Full Name) who is ☐the Tenant, ☐other person occupying such premises, or a ☐member of the tenant's family above the age of fifteen years and residing on or in charge of the premises ________ (Full Name of Person)

☒ By posting in a conspicuous place on the premises at 1151 Colorado blvd. #108 Denver, CO 80206

Signature J. Schuh
Tiana Schuh

**Notice to Quit - §13-40-107, C.R.S.**

(1) A tenancy may be terminated by notice in writing, served not less than the respective period fixed before the end of the applicable tenancy, as follows:
- (a) A tenancy for one year or longer, three months;
- (b) A tenancy of six months or longer but less than a year, one month;
- (c) A tenancy of one month or longer but less than six months, ten days;
- (d) A tenancy of one week or longer but less than one month, or a tenancy at will, three days;
- (e) A tenancy for less than one week, one day.

(2) Such notice shall describe the property and the particular time when the tenancy will terminate and shall be signed by the landlord or tenant, the party giving such notice or his agent or attorney.

(3) Any person in possession of real property with the assent of the owner is presumed to be a tenant at will until the contrary is shown.

(4) No notice to quit shall be necessary from or to a tenant whose term is, by agreement, to end at a time certain.

(5) Except as otherwise provided in §38-33-112, C.R.S., the provisions of subsections (1) and (4) of this section shall not apply to the termination of a residential tenancy during the 90-day period provided for in said section.

Supportive Housing Contract·SHP Housing Program

This Housing Voucher Contract ("Contract") is entered into between the Colorado Coalition for the Homeless ("CCH") which is non-profit corporation, and Vida LLC Owner").

The purpose of this Contract is to assist the Family identified in section 1(A) to lease a decent, safe, and sanitary dwelling unit from the Owner. CCH will make housing assistance payments to the Owner on behalf of the Family in accordance with this Contract. CCH has received a grant from the U.S. Department of Housing and Urban Development, whereby the Department has agreed to provide financial assistance to CCH to make housing assistance payments on behalf of eligible Families.

1.CONTRACT UNIT, FAMILY AND LEASE

(A) This Contract applies only to the Family and the dwelling unit ("Contract unit") designated in this section.

Contract unit: 1151 Colorado Blvd. #108 Denver, Co 80206
(Address of Contract unit, including apartment number, if any, city, State and Zip Code)

Family: Burton Sandles
(Name or names of Family representative (s) )

(B) The Owner shall lease the Contract unit to the Family. The Lease to be executed by the Family and the Owner for the Contract unit has been approved by CCH, and shall be executed in the form approved. The Lease shall contain all previsions required by HUD, and shall not contain any provisions prohibited by HUD.

2.TERM OF CONTRACT

The term of this Contract shall begin on November 6, 2009 (Insert the first day of the term of the Lease). The term of this Contract shall be for one year from the first day of the term of this contract, unless extended or canceled in writing by CCH.

3.RENT: HOUSING ASSISTANCE PAYMENT

(A) The total monthly rent payable to the Owner during the term of this Contract is called the "Contract rent." Initially and until adjustment of the Contract rent in accordance with section 8 of this Contract the Contract rent shall be 728.00 per month.

(B) The portion of the Contract rent payable by the Family ("tenant rent") will be an amount determined by CCH in accordance with HUD regulations and requirements. This amount is the maximum amount the Owner can require the Family to pay for rent of the Contract unit, including all services, maintenance and utilities to be provided by the Owner in accordance with the lease. The amount of the tenant rent is subject to change during the term of the Contract. Any charges in the amount of the tenant rent will be effective on the date stated in a notification by CCH to the Family and the Owner. Initially and until such change the Family shall pay $ 192.00 per month to the Owner as the tenant rent.

(C) Each month CCH shall make housing assistance payment to the Owner on behalf of the Family in accordance with this Contract. The monthly housing assistance payment is equal to the difference between the Contract rent and the tenant rent. The amount of the housing assistance payment shall be determined by CCH. Any change in the amount of the housing assistance payment shall be effective as of the date stated in a notification by CCH to the Family and the Owner. Initially and until such change the amount of the housing assistance payment shall be $ 536.00 per month. Neither CCH nor HUD assumes any obligation for the tenant rent, or for payment of any claim by the owner against the Family. The obligation of CCH is limited to making housing assistance payments on behalf of the Family in accordance with this Contract.

(D) The housing assistance payments to the Owner will continue during the term of this Contract until the tenant rent equals the total Contract rent. However, the termination of a Family's housing assistance payments shall not affect the Family's other rights under the Lease, nor shall such termination preclude the resumption of payments as a result of changes in income or rent or other relevant circumstances during the term of the Contract.

(E) CCH may terminate housing assistance payments under this Contract, because of action or inaction by the Family, in the following cases: (1) if the Family has committed any fraud in connection with any federal housing assistance program, (2) if the Family has violated any of the Family's obligations under the SHP, (3) if the Family has breached an agreement with CCH, or (4) if the family obtains rental assistance through Section 8 or another similar program. CCH shall notify the Owner in writing of its decision to terminate housing assistance payments in such case, and that housing assistance payments pursuant to the Contract shall terminate at the end of the calendar month which follows the calendar month in which CCH gives such notice to the Owner. (For provisions on termination of housing assistance payments, and other remedies, because of Owner's breach of the Contract, see Section 13).

4.MAINTENANCE, OPERATION, AND INSPECTION.

(A) The Owner agrees to maintain and operate the Contract unit and related facilities to provide decent, safe, and sanitary housing in accordance with 24 CFR Section 882.109, including the provision of all the services, maintenance and utilities as agreed to in the Lease. If CCH determines that the Owner is not meeting this obligation, CCH shall have the right, even if the Family continues in occupancy, to terminate or reduce housing assistance payments to the Owner, and to terminate the Contract.

(B) CCH shall have the right to inspect the Contract unit and related facilities at least annually and at such other times as may be necessary, in the determination of CCH, to assure that the unit is in decent, safe and sanitary condition, and that the Owner is providing all the services, maintenance and utilities agreed to under the Lease.

(C) If CCH determines that the Contract unit is not in decent, safe, and sanitary condition because of an increase in Family size, or a change in Family composition, or that the Family is residing in a unit larger than appropriate because of a reduction in Family size or change in Family composition, CCH may terminate the Contract upon notice by CCH to the Owner.

(D) Maintenance and replacement (including redecoration) shall be in accordance with the standard practice for the building concerned as established by the Owner.

5.MONTHLY PAYMENT TO OWNER

(A) The Owner shall be paid under this Contract on or about the first day of the month for which payment is due. The owner agrees that the endorsement on the check:

(1) shall be conclusive evidence that the Owner has received the full amount of the housing assistance payment for the month, and

(2) shall be a certification by the owner that:

(i) the contract unit is in decent, safe, and sanitary condition and the Owner is providing all the services, maintenance and utilities as agreed to in Lease,

(ii) the Contract unit is leased to the Family named in section 1(A), and the Lease is in accordance with section 1 (B).

(iii) the Contract rent does not materially exceed rents charged by the Owner for other comparable unassisted units,

(iv) except for the housing assistance payment and the tenant rent as provided under this contract, the owner has not received and will not receive any payments or other consideration (from the family, CCH, HUD, or any other public or private source) as rent for the Contract unit,

(v) the family does not own or have any interest in the Contract unit (except in the case of housing assistance on behalf of the Owner of a manufactured home, to assist in leasing a manufactured home space). If the Owner is a cooperative, the Family may be a member of the cooperative, and

(vi) to the best of the Owner's knowledge, the members of the family occupy the Contract unit and the unit is used solely for residence by the family, and as the family's principal place of residence.

(B) If CCH determines that the Owner is not entitled to the payment or any part of it, CCH, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the Owner, including amounts due under any other housing assistance payments contract.

6.SECURITY DEPOSITS AND CCH REIMBURSEMENT FOR UNPAID RENT AND DAMAGES:

(A) The Owner will comply with HUD regulations regarding security deposits from a tenant (24 CFR Section 882.112), and shall not collect a security deposit which is more than the maximum amount permitted under the regulations.

(B) After the family moves from the Contract unit, the owner may (subject to State and local law) use the security deposit, including any interest on the deposit, as reimbursement or any unpaid tenant rent or other amounts which the family owes under the lease. The Owner will give the family a written list of all items charged against the security deposit and amount of each item. After deducting the amount used as reimbursement to the Owner, the Owner shall promptly refund the full amount of the balance to the family.

7.NO PAYMENT AFTER FAMILY MOVES:

Housing assistance payments shall be made by CCH to the Owner under this Contract only for the period during which the Contract unit is leased and occupied by the Family. If the Family moves out, the Owner shall promptly notify CCH and CCH shall make no additional housing assistance payment to the Owner for any month after the month in which the Family moves. The Owner may retain the housing assistance payment for the month in which the family moves.

8.RENT ADJUSTMENTS:

(A) If the Contract unit is in decent, safe and sanitary condition and the Owner is otherwise in compliance with the terns if the lease and this Contract, the Contract rent may be adjusted as follows:

(1) The Contract rent may be adjusted as of any annual anniversary date of the Contract upon written request by the Owner. Such request shall be made at least 60 days prior to the anniversary date of the lease, and shall set forth the Owner's justification for the increase in rent.

(2) CCH shall notify the Owner within 30 days of a request for a Contract rent adjustment as to whether it accepts or rejects the Owner's request.

(B) Adjustments as provided in paragraph (A) of this section shall not result in material differences between the rents charged for assisted and comparable unassisted units as determined by CCH in accordance with HUD requirements.

9.TERMINATION OF TENANCY:

(A) The Owner shall not terminate the tenancy of the family except for:

(1) Serious or repeated violation of the terms and conditions of the Lease;

(2) Violation of Federal, State or local law which imposes obligations on the family in connection with the occupancy and use of the dwelling unit and surrounding premises; or

(3) Other good cause.

(B) The Owner may evict the family form the Contract unit only by instituting a court action. The Owner must notify CCH in writing of the commencement of procedures for termination of tenancy, at the same time that the Owner gives notice to the family under State or local law. The notice to CCH may be given by furnishing to CCH a copy of the notice to the family.

10. NONDISCRIMINATOIN IN HOUSING:

(A) The Owner shall not, in the provision of services, or in any other manner, discriminate against any person on the ground of age, race, color, creed, religion, sex, handicap or national origin. Unwed parents, families with children born out of wedlock and recipients of public assistance shall not be excluded from participating in, or be denied the benefits of, the program because of such status.

(B) The Owner shall comply with all requirements imposed by Title VIII of the Civil Rights Act of 1968, and any related rules and regulations.

(C) The Owner shall comply with all requirements imposed by Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq.; the HUD regulations issued thereunder, 24 CFR, Subtitle A, Part 1, the HUD requirements pursuant to these regulations; and Executive Order 11063, to the end that, in accordance with that act, the regulations and requirements of HUD and Executive Order 11063, no person in the United States shall, on the grounds of race, color, creed, religion or national origin, be excluded from participation in, or denied the benefits of, Section 8 Existing Housing Program, or be otherwise subjected to discrimination. This provision is included, pursuant to the regulations of HUD, 24 CFR, Subtitle A, Part 1, issued under Title VI of the Civil Rights Act of 1064, and the HUD requirements pursuant to the regulations. The obligation of the Owner to comply with these requirements inures to the benefit of the United States of America, HUD, and CCH, any of which shall be entitled to invoke any remedies available by law to redress any breech or to compel compliance by the Owner.

(C) In accordance with any rules an regulations issued by HUD under Section 504 of the Rehabilitation Act of 1973, the Owner shall not discriminate against any person on the basis of handicap.

(D) The Owner shall comply with any rules and regulations issued by HUD under the Age Discrimination Act of 1975.

11. COOPERATION IN EQUAL OPPORTUNITY COMPLIANCE REVIEWS:

The Owner shall cooperate with CCH and HUD in conducting compliance reviews and complaint investigations pursuant to all applicable civil rights statues, Executive Orders, and all related rules and regulations.

12. CCH AND HUD ACCESS TO PREMISES AND OWNER'S RECORDS:

(A) The Owner shall provide any information pertinent to this Contract which CCH or HUD may reasonably require.

(B) The Owner shall permit CCH or HUD or any of their authorized representatives to have access to the premises and, for the purpose of audit examination, to have access to any books, documents, papers and records of the Owner to the extent necessary to determine compliance with this Contract only, including the verification of information pertinent to the housing assistance payments.

13.RIGHT OF CCH IF OWNER BREACHES THE CONTRACT:

    (A)    Any of the following shall constitute a breach of the Contract:

        (1)    If the Owner has violated any obligation under this Contract; or

        (2)    If the Owner has demonstrated any intention to violate any obligation under this Contract; or

        (3)    If the Owner has committed any fraud or made any false statement to CCH or HUD in connection with the Contract, or has committed fraud or made any false statement in connection with any federal housing assistance program.

    (B)    If CCH determines that a breach has occurred, CCH may exercise any of its rights or remedies under the Contract.   CCH shall notify the Owner in writing of such determination, including a brief statement of reasons for the determination.  The notice by CCH to the Owner may require the Owner to take corrective action (as verified by CCH) by a time prescribed in the notice.  CCH's rights and remedies under the Contract include recovery of overpayments, termination or reduction of housing assistance payments, and termination of the Contract.

    (C)    Any termination or reduction of housing assistance payments, or termination of the Contract by CCH in accordance with this contract, shall be effective as provided in a written notice by the CCH to the Owner.

    (D)    CCH's exercise or non-exercise of any remedy for Owner breach of this Contract shall not constitute a waiver of the right to exercise that or any other right or remedy at any time.

14. CCH  RELAION TO THIRD PARTIES:

    (A)    CCH does not assume any responsibility for, or liability to, any person injured as a result of the Owner's action or failure to act in connection with the implementation of this Contract, or as a result of any other action or failure to act by the Owner.

    (B)    The Owner is not the agent of CCH, and this Contract dos not create or affect any relationship between CCH and any lender to the Owner or any suppliers, employees, contractors or subcontractors used by the Owner in connection with implementation of this Contract.

    (C)    Nothing in this contract shall be construed as creating any right of the Family or other third party (other than HUD) to enforce any provision of this Contract, or to assert any claim against HUD, the CCH or the Owner under this Contract.

15. CONF LICT OF INTEREST PROVISIONS:

    No present or former member or officer of CCH, no employee of CCH, and no public official or member of a governing body or State or local legislator shall have any direct or indirect interest, during this person's tenure or for one year thereafter, in this Contract or in any proceeds or benefits arising from the Contract.  This provision may be waived by HUD for good cause.

16. INTEREST  OF MEMBERS OF OR DELEGATES TO CONGRESS:

    No member of or delegate to the congress of the United States of America or resident commissioner shall be admitted to any share or part of this Contract or to any benefits which may arise from it.

17. TRANS FER OF THIS CONTRACT:

The Owner has not made and will not make any transfer in any form of this Contract without the prior written consent of CCH. A change in ownership of the Owner, such as a stock transfer or transfer of the interest of a limited partner, is not subject to the provisions of this section. CCH shall give its consent to a transfer of the contract if the transferee agrees in writing (in a form acceptable to CCH) to comply with all the terms and conditions of this Contract. The transferee shall give CCH a copy of the executed agreement.

18. CONDITIONS FOR THE HOUSING ASSISTANCE PAYMENTS:

The rights of the Owner to receive housing assistance payments under this Contract shall be subject to compliance with all the provisions of this Contract.

19. ENTIRE AGREEMENT; INT ERPRETATION:

(A) This Contract contains the entire agreement between the Owner and CCH. No changes in this Contract shall be made except in writing signed by both the Owner and CCH.

(B) The Contract shall be interpreted and implemented in accordance with HUD requirements.

20. WARRANTY OF LEGAL CAPACITY AND CONDITION OF UNIT:

(A) The Owner warrants (1) that the unit is in decent, safe, and sanitary condition as defined in 24 CFR Section 882.109, and (2) that the Owner has the legal right to lease the dwelling unit covered by this Contract during the Contract term.

(B) The party, if any, executing this Contract on behalf of the Owner hereby warrants that authorization has been given by the Owner to execute it on behalf of the Owner.

Signatures:

Colorado Coalition for the Homeless

By: Caitlyn Davis CCH 11/6/09
Signature Date Signed

Official title: Housing Counselor, 16th St. HF

Owner: Vida LLC
Type or print name of owner

By: D. Schuh 11/6/09
Signature Date Signed

Tiana Schuh Controller
Type or print name and title of signatory

Warning: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willingly makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

CAA COLORADO APARTMENT ASSOCIATION

# APARTMENT LEASE CONTRACT

**This is a Binding Legal Document. If not understood, legal, tax or other counsel should be consulted before signing.**

Date of Lease Contract: November 6th, 2009
(when the Lease Contract is filled out)

1. **PARTIES.** This Lease Contract is between you, the resident **(list all people signing the Lease Contract):** Burton Sandles

(collectively "Resident") and us, the owner of the apartment or its authorized agent: Residential Niche/Vida LLC

("Owner"). Resident agrees to rent Apartment No. 108, at 1151 (street Colorado Blvd address) in Denver, Colorado, 80206 (zip code), in Denver County (the "Apartment"), for use as a private residence only. If anyone else has guaranteed performance of this Lease Contract, they also need to sign this Lease Contract (collectively "Guarantors").

2. **OCCUPANTS.** The Apartment will be occupied only by Resident and **(list all other occupants not signing the Lease Contract):**

NO OTHERS

No one else may occupy the Apartment without Owner's prior written consent, which consent may be withheld in the sole discretion of the Owner and which, as a condition of being granted, may require the submission of an application and the long form to a background check. A person shall be considered to be occupying the Apartment if the person reasonably appears to be using the Apartment as a place to live. Indications of occupancy shall include, but not be limited to: coming and going to the Apartment with the use of a key, providing any third-party (including the police) with the address of the Apartment as that person's residential address, receiving mail at the Apartment, keeping clothes or personal effects at the Apartment, commonly being present in the Apartment or common areas of the apartment community, or commonly parking the person's vehicle for extended periods of time or overnight. A person may establish unauthorized occupancy of the Apartment and thereby create a violation of this Lease Contract, even if that person owns or leases other residential property. Resident is responsible for the conduct of any and all occupants and guests. Any person in the common areas coming to or from the Apartment shall be Resident's guest.

3. **CONTRACT TERM.** The initial term of the Lease Contract begins on the 6 day of November 09, and ends at midnight the 30 day of November 10. Resident must give written move-out notice as required by paragraph 4.

4. **NOTICE TO QUIT AND HOLDOVER. Resident agrees, at least thirty (30) days prior to the expiration of the term, to give written notice to Owner of Resident's intention to vacate the Apartment at the end of the term of the Lease Contract. If such notice is not timely given, Resident shall be liable for and agree to pay Owner the rent due for the following month if the Apartment is not re-rented. Owner is not obligated to give 30 days notice. Owner must give the appropriate notice provided for in the Colorado Revised Statutes, which in some cases is as little as 3 days notice.** In the event that Resident holds over the Apartment after the term of the Lease Contract, the tenancy shall be deemed a month-to-month residency at an increased monthly rental rate if Owner gives written notice to Resident of such rental rate increase at least 45 days prior to the effective date of the rental rate increase. All other provisions of the Lease Contract, including the provision requiring Resident to give at least 30 day notice of Resident's intention to vacate, shall remain in full force and effect. **Regardless of the number of days in a month, Resident agrees that notices tendered after the first day of any month shall not be effective to terminate this Lease Contract until the last day of the following month (example: notice received on June 3 will not terminate lease until July 31).**

5. **SECURITY DEPOSIT.** A. Resident has deposited with Owner the sum of $ 300 as security deposit against the breach of any of Resident's covenants and agreements contained herein, including without limitation: damage to the building of which the Apartment is a part, common areas and buildings owned by Owner and surrounding or adjacent to the building which the Apartment is a part, furniture, fixtures, appliances, and carpet; abandonment of the Apartment; nonpayment of rent, late charges, insufficient check charges, and attorneys' fees.

B. The security deposit or other like amounts received by Owner from Resident pursuant to this Lease Contract will be held and disbursed subject to the terms of this Lease Contract and law. In the event Owner appoints his agent, broker, or manager to hold and disburse said funds, Resident hereby consents to such appointment. In the event of a sale of the Apartment by Owner, upon Owner's compliance with the applicable law, Resident will look solely to the successor owner, or said owner's agent, broker or manager, as the case may be, for satisfaction of all claims relating to said security deposit, and shall not look to original Owner. It is agreed that Residential Niche shall initially hold the security deposit, subject to further assignment, as authorized.

6. **KEYS.** Resident will be provided 1 apartment key(s), 1 mailbox key(s), 0 garage door openers, and 0 other key(s) for [illegible]. **KEYS MUST NOT BE DUPLICATED.** Any Resident or occupant who has permanently moved out according to a remaining Resident's affidavit is (at Owner's option) no longer entitled to occupancy or keys.

7. **RENT; CHARGES.** Resident shall pay $ 700 per month for rent, payable in advance and without demand: **(check one)**

X at the on-site manager's office, or rent drop box
X at 3130 W. Louisiana Ave #102 Denver, CO 80219

**Resident must pay rent on or before the 1st day of each month (due date) with no grace period.** Owner may, at Owner's option, require at any time that Resident pay all rent and other sums in certified or cashier's check, money order, or one monthly check, rather than multiple checks. However, **cash is unacceptable without Owner's prior written permission.** Prorated rent to the first of the next month is $ 1,006.45. If Resident doesn't pay rent or other charges on time, all remedies under this Lease Contract will be authorized. If Resident doesn't pay all rent on or before the 5th day of the month Resident shall pay an initial late charge of $ 50, plus a late charge of $ 10 per day until paid in full. Resident shall pay a charge of $ 50 for each returned check, plus initial and daily late charges from due date until Owner receives acceptable payment. Resident may **not withhold or offset rent for any reason.**

The Apartment will be: ______ furnished; or X unfurnished.

8. **UTILITIES.** Resident shall pay for the following items, if checked: ____ water; ____ gas; ____ electricity; X cable TV, ____ wastewater; ____ trash; X master antenna.

Resident shall pay for all other utilities, related deposits, connect and disconnect fees, and charges on utility bills delivered to the Apartment or connected in Resident's name or during Resident's tenancy. Resident must not allow utilities to be disconnected - including disconnection for not paying bills - until the Lease Contract term or renewal period ends. Owner, at Owner's option, may pay any past due utility bill on behalf of Resident add the amount paid to the balance due by Resident under this Lease Contract and proceed against utilize all remedies available against Resident for nonpayment of amounts due under this Lease, including termination of the right of possession and the accruing of late fees on the amounts advanced. Cable channels that Owner provides, if any, may be changed during the Lease Contract term. Utilities may be used only for normal household purposes and must not be wasted. If electricity is ever interrupted, use only battery-operated lighting. Owner does not warrant, represent or guarantee that utility services will be uninterrupted during the term of this Lease Contract. To the extent an interruption of utilities is within the control of Owner, Owner shall use reasonable efforts to restore interrupted utility service. In the event a utility provider bills Owner for utilities associated with the Apartment which are combined with utilities for other apartments within the apartment community, Owner may allocate those utility charges between the various apartments using a formula based on sub-metering, comparative square footage, number of bedrooms, or number of bathrooms, at the choice of Owner and Owner shall be free to change the method of allocation during the term of this Lease Contract. Additionally, Owner or a third-party billing service may charge a reasonable monthly fee for the cost of administering and billing any shared utility charges.

9. **INSURANCE. Owner does not warrant, represent or guarantee the safety of Resident's personal property. Resident hereby releases Owner from any and all claims for damage or loss to Resident's personal property and shall indemnify and hold Owner harmless, including Owner's attorney fees and costs, from any claims associated with Resident's personal property regardless of by whom such claims are brought, including Resident's insurer. Owner advises Resident to obtain insurance for losses due to theft, fire, smoke, water damage, and the like. OWNER'S INSURANCE POLICIES PROVIDE NO COVERAGE FOR RESIDENT'S PROPERTY, INCLUDING RESIDENT'S AUTOMOBILE.**

10. **DELAY OF OCCUPANCY.** If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, Owner shall not be liable to Resident for the delay. The Lease Contract will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) Resident's right to terminate as set forth below. If the delay is longer than 3 days, Resident shall have the right to terminate this Lease Contract (if no date is filled in, it shall mean 7 days). The termination notice must be in writing. After termination, Resident is entitled only to a refund of the deposit(s) and any rent paid. Rent abatement or Lease Contract termination does not apply if delay is for cleaning or repairs that don't prevent Resident from occupying the Apartment.

11. **COPIES AND ATTACHMENTS.** This Lease Contract has been executed in multiple copies - one for Resident and one or more for Owner. By signing the Lease Contract, Resident acknowledges the receipt of a copy of the Lease Contract and all its attachments. Resident should retain a copy of the lease contract and all attachments.

12. **REIMBURSEMENT FOR REPAIRS.** Resident shall promptly reimburse Owner for all loss, damage, or cost of repairs or service in the Apartment or to the exterior of the Apartment regardless of the cause or by whom damaged, except for damage caused by the Owner or which is the result of ordinary wear and tear. Resident shall promptly reimburse Owner for loss, damage, or cost of repairs or service caused anywhere in the apartment community by Resident or any guest's or occupant's improper use or negligence. Owner may require payment at any time, including advance payment of repairs for which Resident is liable. Any delay in Owner demanding sums owed shall not be a waiver.

13. **RENT INCREASES AND LEASE CONTRACT CHANGES.** No rent increases or Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any signed written addendum or by reasonable changes of apartment rules. If, at least 45 days before the Lease Contract term or renewal period ends, Owner gives Resident written notice of rent increases or Lease Contract changes effective when the Lease Contract term or renewal period ends, this Lease Contract will automatically continue month-to-month with the increased rent or Lease Contract changes. The new modified Lease Contract will begin on the date stated in the notice (without the necessity of Resident's signature) unless Resident give Owner 30-days written move out notice (under paragraph 4).

14. **DISCLOSURE RIGHTS.** Owner may disclose the identities and addresses of Resident and all occupants to any requesting law enforcement or other governmental agency, including the U.S. Census Bureau. Owner shall not be obligated to disclose any information to any other third-party. At Owner's option, Owner may disclose information regarding rental history if requested or authorized by Resident in writing.

Initials: [illegible]

For use by CAA members only. Photocopies or reproductions are not valid.

23. **PETS. No pets are allowed (even temporarily) anywhere in the Apartment or apartment community unless Owner has so authorized in writing, except for service animals of disabled persons.** If Owner allows a pet, Owner may require Resident to sign a separate pet agreement. Pet prohibitions apply to all mammals, reptiles, birds, fish, rodents, and insects. Resident must not feed stray animals. If Resident or any guest or occupant violates pet restrictions (with or without Resident's knowledge), Resident shall be subject to the charges, damages, eviction, and other remedies provided in this Lease Contract. A pet deposit is considered a general security deposit and Owner may apply it to any amount due under the Lease Contract. Owner may require a written statement of need from an appropriate doctor for a service animal for disabled persons. If a pet has been in the Apartment at any time during the term of occupancy (with or without Owner's consent), Owner may charge Resident for defleaing, deodorizing, or shampooing to protect future Residents from possible health hazards.

24. **WHEN WE MAY ENTER.** If Resident or any guest or occupant is present, then Resident shall allow repairers, servicers, or Owner's representatives to peacefully enter the Apartment at reasonable times for the purposes listed in (2) below. If nobody is in the Apartment, then repairers, servicers, or Owner's representatives may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means if locks have been changed in violation of this Lease Contract) if:

(1) written notice of the entry is left in a conspicuous place in the Apartment immediately after the entry; and

(2) entry is for: responding to Resident's request; repairs; estimating repair or refurbishing costs; pest control; preventative maintenance; filter changes; testing or replacing smoke-detector batteries; retrieving tools or appliances; preventing waste of utilities; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or security devices; removing or rekeying unauthorized security devices; stopping excessive noise or other disturbances; removing health or safety hazards (including hazardous materials) and items prohibited under Owner's rules; retrieving property owned or leased by former residents; inspections; entry by a law-enforcement officer with or without a search or arrest warrant or in hot pursuit; showing the Apartment to prospective Residents (after move-out or vacate notice has been given); or showing the Apartment to government inspectors, fire marshals, lenders, appraisers, prospective buyers, or insurance agents.

25. **MULTIPLE RESIDENTS OR OCCUPANTS.** Each Resident is jointly and severally liable for all Lease Contract obligations. If Resident or any guest or occupant violates the Lease Contract or rules, all Residents are considered to have violated the Lease Contract. Owner's requests and notices (including sale notices) to any Resident constitute notice to all Residents and occupants. Notices and requests from any Resident or occupant (including notices of Lease Contract termination, repair requests, and entry permissions) constitute notice from all Residents. In eviction suits, any one of multiple Residents is considered the agent of all other Residents in the Apartment for service of process. Security deposit refunds may be by one check jointly payable to all Residents; the check and any deduction itemizations may be mailed to any one Resident only.

26. **REPLACEMENTS AND SUBLETTING.** Replacing a Resident or subletting is allowed **only when Owner consents in writing,** which consent may be withheld in Owner's sole and absolute discretion. If departing or remaining Residents procure a replacement resident acceptable to Owner before moving out and Owner expressly consents to the replacement or subletting, then a reletting or administrative fee may be due; and Resident **will** remain liable for all Lease Contract obligations for the rest of the original Lease Contract term.

**Credits.** Owner shall credit all subsequent rent that Owner actually receives from replacement or subsequent residents against Residents liability for past-due and future rent. If Resident moves out early, Owner shall exercise customary diligence to relet.

**Procedures.** If Owner approves a replacement resident, then Owner may, at Owner's option, require that either: (1) the replacement resident sign this Lease Contract with or without an increase in the total security deposit; or (2) the remaining and replacement residents sign an entirely new Lease Contract. Unless we agree otherwise in writing, Resident's security deposit will automatically transfer to the replacement resident as of the date of Owner approval. The departing Resident will no longer have a right of occupancy or to a security deposit refund, but will remain liable for the rest of the original Lease Contract term unless agreed otherwise in writing.

27. **DEFAULT BY OWNER.** Owner shall act with customary diligence to:
(1) keep common areas reasonably clean;
(2) maintain fixtures, furniture, hot water, heating and A/C equipment, as applicable, and;
(3) make all reasonable repairs, subject to Resident's obligation to pay in advance for damages for which Resident is responsible pursuant to this Lease Contract;

If Owner violates any of the above, (a) Resident must make a written request for repair or remedy of the condition, and all rent must be current at the time; (b) after receiving the request, Owner shall have a reasonable time to repair, considering the nature of the problem and the reasonable availability of materials, labor, and utilities; (c) if Owner hasn't diligently tried to repair within a reasonable time and the requested repair is necessary for the Apartment to be habitable, Resident must then give Owner written notice of intent to terminate the Lease Contract unless the repair is made within 7 days; and (d) if repair hasn't been made within a reasonable time and still remains unrepaired after the 7 day notice period and the requested repair is necessary for the Apartment to be habitable , Resident may terminate the Lease Contract by immediately moving out of the Apartment, but in no event is Resident allowed to off-set or withhold rent. Owner's failure to provide or maintain any recreational, laundry or other facility or common area, or to repair any property or premises, shall not constitute a breach of this Lease Contract by Owner. Owner may temporarily or permanently alter, change or remove any common area or amenity during the term of this Lease Contract.

Initials

28. **DEFAULT BY RESIDENT.** Resident shall be in default if: (1) Resident fails to pay rent or other amounts provided by this Lease Contract when due; (2) Resident or any guest or occupant violates this Lease Contract, apartment rules, or fire, safety, health, or criminal laws, regardless of whether arrest or conviction occurs; (3) Resident abandons the Apartment; (4) Resident gives or gave incorrect or false information in a rental application; (5) Resident or any occupant is arrested for a criminal offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia as defined in Colorado Law; or (6) any illegal drugs or paraphernalia are found in the Apartment. If in default, Owner may exercise one or more of the following remedies, without limiting any other right or remedy:

**Eviction. If Resident defaults, we may end Resident's right of occupancy by giving the notices required by Colorado Law and exercising all legal rights.** Notice may be by: (1) personal delivery to any Resident; (2) personal delivery at the Apartment to any occupant over 18 years old; or (3) affixing the notice to the Apartment's main entry door. Termination of possession rights or subsequent reletting doesn't release Resident from liability for future rent. After giving notice to vacate or filing an eviction suit, we may still accept rent or other sums due; the filing, or acceptance doesn't waive or diminish Owner's right of eviction or any other contractual or statutory right. Accepting money at any time doesn't waive Owner's right to damages, past or future rent, or other sums.

**Reletting Charge.** If Owner takes possession of the Apartment because Resident fails to give 30-day written move-out notice; Resident moves out without Owner's written approval and without paying rent in full for the entire Lease Contract term or renewal period; Resident moves out at Owners demand because of Resident's default; a judgment for possession is entered against Resident; or Resident refuses to take possession of the Apartment, resulting in a breach of this Lease Contract, Owner will charge Resident $ 600 as a reletting charge, which is neither a Lease Contract cancellation fee nor a buyout fee, does not release Resident from continued liability for future or past-due rent, cleaning, repairing, repainting, lock changes, or other sums due. Rather, the reletting charge is to reimburse Owner for Owner's damages, for, Owner's time, effort, and expense in finding and processing a replacement tenant, advertising, showing Apartments, utilities for showing, checking prospects, office overhead, marketing costs, and locator service fees. The reletting charge is an estimate by Resident and Owner of the reasonable and anticipated costs of reletting and is intended to serve as liquidated damages. The reletting charge is due whether or not Owner's reletting attempts succeed.

**Acceleration.** All monthly rent for the rest of the Lease Contract term or renewal period shall be accelerated automatically without notice or demand (before or after acceleration) and will be immediately due and delinquent if, without Owner's written consent: (1) Resident moves out, removes property in preparing to move out, or gives oral or written notice (by Resident or any occupant) of intent to move out before the Lease Contract term or renewal period ends; and (2) Resident has not paid all rent for the entire Lease Contract term and renewal period. Such conduct is considered a default for which Owner need not give Resident notice. Remaining rent will also be accelerated if a judgment for possession enters against Resident or Resident moves out when Owner demands possession because of a default. Owner's right to accelerate is in lieu of having rent for the entire term payable when the Lease Contract begins.

**Attorney Fees and Other Remedies.** Owner may report unpaid amounts to credit or collection agencies. Upon default, Owner shall have all other legal remedies, including Lease Contract termination. Resident hereby agrees that in the event of the retention, employment or use of an attorney by Owner because of any violation or breach of any covenant or provision of this Lease Contract, Resident shall pay Owner's attorney fees, all of which shall be considered additional rent. Resident shall be responsible for said fees whether or not litigation is actually commenced, and Resident shall be responsible for said fees because of any breach by any occupant or guest. If Resident's account is placed for eviction or collection, Owner may recover all costs of eviction or collection, including a reasonable sum for attorney fees, whether or not a suit is filed. Late charges are liquidated damages for Owner's time, inconvenience, and overhead in collecting late rent (but are not for attorney's fees and litigation costs). All unpaid amounts bear 18% interest per year from due date, compounded monthly. Resident shall pay all collection agency fees in addition to the amounts that are due under this Lease Contract.

**In signing the lease both parties are responsible for the contents of the lease in its entirety.**

Resident or Residents and Guarantor(s) (all sign below)
(date)
(date)
Owner or Owner's Representative (signs below)
(date)

For use by CAA members only. Photocopies or reproductions are not valid.

29. **INTERPRETING THIS LEASE CONTRACT.** **Neither Owner nor any of Owner's representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement. Owner's representatives (including management personnel, employees and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, and no authority to make promises, representations, or agreements that impose security duties or other obligations on Owner or Owner's representatives unless in writing.** All notices and documents shall be in English or, at Owner's option, in any language that Resident reads or speaks. No action or omission of Owner's representative will be considered a waiver of any subsequent violation, default, or time or place of performance. Owner not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, liens, or other rights isn't a waiver under any circumstances. Exercising one remedy shall not constitute an election or waiver of other remedies. All remedies are cumulative. No employee, agent, or management company is personally liable for any of Owner's contractual, statutory, or other obligations merely by virtue of acting on Owner's behalf. Neither an invalid clause nor the omission of initials invalidates this Lease Contract. All provisions regarding Owner's non-liability and non-duty apply to Owner's employees, agents, and management companies. This Lease Contract is subordinate to existing and future recorded mortgages. All Lease Contract obligations must be performed in the county where the Apartment is located. Resident shall not record this Lease Contract.

30. **PAYING SUMS DUE.** Payment of all sums is an independent covenant. At Owner's option and without notice, Owner may apply money received first to non-rent obligations, then to rent, regardless of notations on checks or money orders and regardless of when the obligations arise. All sums other than rent (which is due on the first day of each month without demand) are due upon Owner's demand. After the due date and any cure period provided by state law, Owner does not have to accept the rent or any other payments.

31. **CAA MEMBERSHIP.** Owner represents that at the time this Lease Contract is executed by Owner: (1) Owner; or (2) the management company that represents Owner, is a member in good standing of both the Colorado Apartment Association and the affiliated local apartment association for the area where the Apartment is located. If not, this Lease Contract is voidable at Resident's option and is unenforceable by Owner (except for property damages) and Owner may not recover past or future rent or other charges.

32. **MOVE-OUT PROCEDURES.** Once a move-out date is established by the written notice required of Resident or Owner by this Lease Contract, the move-out date can't be changed unless agreed in writing. Resident shall not move out before the Lease Contract term or renewal period ends unless all rent for the entire Lease Contract term or renewal period is paid in full. Early move-out may result in acceleration of future rent and reletting charges. Before moving out, Resident shall pay all rent through the end of the Lease Contract term or renewal period. Resident won't stay beyond the date Resident is supposed to move out. Resident shall give Owner and the U.S. Postal Service, in writing, each Resident's forwarding address.

33. **CLEANING.** Resident shall thoroughly clean the Apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, and storage rooms at the time of move-out. Resident shall follow Owner's move-out cleaning instructions. If Resident does not clean adequately, Resident shall be liable for reasonable cleaning charges - including charges for cleaning carpets, draperies, furniture, walls, etc.

34. **MOVE-OUT INSPECTION.** Resident and Owner may meet for a move-out inspection. Owner's representative has no authority to bind or limit Owner regarding deductions for repairs, damages, or charges. Any statements or estimates by Owner or Owner's representative are subject to Owner's correction, modification, or disapproval before final refunding or accounting.

35. **OTHER CHARGES.** Resident shall at all times be liable for the following charges, if applicable: unpaid rent; unpaid utilities and utility disconnect fees; unreimbursed service charges; damages or repairs (beyond reasonable wear and tear); replacement cost of property that was in or attached to the Apartment and is missing; replacing dead or missing smoke detector batteries; utilities for repairs or cleaning; trips to let in company representatives to remove telephone or TV cable services or rental items; trips to open the Apartment when Resident or any guest or occupant is missing a key; key duplicates; unreturned keys; missing or burned-out light bulbs; stickers, scratches, burns, stains, or unapproved holes; removing or rekeying unauthorized security devices or alarm systems; reletting charges; packing, removing, or storing property removed or stored; removing illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false security alarm charges unless due to Owner's negligence; government fees or fines against Owner for Resident's violation of the Lease Contract or law; late-payment and returned-check charges; or in any valid eviction proceeding against Resident, plus attorney's fees, court costs, and filing fees actually paid; and other sums due.

36. **DEPOSIT RETURN; SURRENDER; ABANDONMENT.** A. Resident **surrenders** the Apartment on the date of the earlier of the following: (1) Resident and all occupants and their possessions have been removed and all keys have been turned in where rent is paid; or (2) the move-out date has passed and no Resident or authorized occupant is living in the Apartment in Owner's reasonable judgment. Resident **abandon** the Apartment when: (1) everybody appears to have moved out in Owner's reasonable judgment; or (2) clothes, furniture, and personal belongings have been substantially removed from the Apartment. An apartment is also abandoned on the 10th day after the death of a sole Resident. Surrender or abandonment ends Resident's right of possession for all purposes, including reletting the Apartment, damages, clean-up charges, removing property left in the Apartment, and return of the security deposit.

B. Resident agrees that if Resident abandons or surrenders the Apartment and leaves behind personal property, Owner shall have the right, but not the obligation, to remove and dispose of said personal property as Owner sees fit, at Resident's sole risk and cost and without recourse by Resident or any person claiming under Resident against Owner or Owner's representatives. Resident shall indemnify and hold harmless Owner and Owner's agents and representative against any claim or cost for any damages or expense with regard to the removal, disposal and/or storage of the property.

C. Within sixty (60) days after termination of this Lease Contract or surrender and acceptance of the Apartment, whichever occurs last, Owner shall provide Resident, at Resident's last known address, with a written statement listing the reasons for any and all charges against the security deposit, and refund the balance of the security deposit (if any) therewith. The security deposit shall be returned to Resident only after each and all of the following conditions have been met or the corresponding charges have been applied:

1. There are no unpaid charges, damages, or rentals due by Resident hereunder.

2. The Apartment, including kitchen appliances, have been cleaned thoroughly, in accordance with any written Move-Out Policy we provided, and the Apartment shall have been left in the same condition as when Resident moved in, except for ordinary wear and tear. If Resident fails to clean thoroughly and/or in accordance with the written Move-Out Policy, reasonable charges to complete such cleaning shall be deducted.

3. After inspection by Owner, appropriate charges will be deducted for any unpaid damages or repairs to the Apartment or its contents (beyond reasonable wear); insufficient light bulbs, stickers, scratches, burns or holes, etc., on the walls, doors floors, draperies, carpets and/or furniture, etc.

**D. Resident acknowledges and agrees that in no event shall said security deposit be applied by Resident for any rent or charge due hereunder without the Owner's prior written approval.**

37. **SATELLITE DISH.** Resident may in some limited circumstances be allowed to install a satellite reception dish, subject to the following limitations and restrictions: Only one dish or other reception device may be installed. The dish shall be no larger than 1 meter in diameter. The dish may be installed only within the Apartment. The Apartment includes private balconies, balcony railings, terraces, patios, yards and gardens. However, the Apartment does not include any outside walls, roofs, window sills or common balconies, railings, patios, yards or other common areas in the community. No part of the dish may extend beyond the outside balcony rail or patio line. Resident shall remain fully and solely liable and responsible for the safety of the satellite dish and for any damage caused to persons or property associated with the satellite dish. Resident hereby indemnifies and shall hold Owner harmless from any and all claims based on damage to or injury by the dish. Any Resident who installs a satellite dish must maintain a renter's property insurance policy, which includes general liability coverage. No dish may be installed in a fashion which will damage the Apartment beyond ordinary wear and tear. No holes may be drilled in exterior surfaces, including walls, roofs, glass, balcony floors or railings. Any "Hook-Up" between interior and exterior equipment must be accomplished with flat cable capable of fitting below a door jam or by means of a device that allows the signal to pass through the exterior wall, door or glass without wiring. Interior holes must be fully repaired and painted to the exact match of the existing wall when Resident vacates the Apartment.

39. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed Lease Contract form:

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

**Initials** ________

Copyright 1997 - Colorado Apartent Association, Inc.
CAA Form 1 - Printed October 1997 (rev. 6/06)

15. **COMMUNITY POLICIES OR RULES.** Resident and all guests and occupants must comply with this Lease Contract, written apartment rules and community policies, including instructions for care of the property. Owner's rules are a part of this Lease Contract. Owner may make reasonable changes to written rules, effective immediately, if distributed and applicable to all units in the apartment community.

16. **CONDUCT.** The Apartment and other areas reserved for Resident's private use must be kept clean and sanitary. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. Swimming pools, saunas, hot tubs, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in or near pools and other common areas. Owner may regulate: (1) the use of patios, balconies, and porches, including the prohibition of the storage or use of barbeque grills and flammable substances; (2) the conduct of furniture movers and delivery persons; and (3) recreational activities in common areas. Resident shall be liable to Owner for damage caused by Resident or any guests, agents, or occupants.

Owner may exclude guests or others who, in Owner's judgment, have been violating or about to violate the law, violating or about to violate this Lease Contract or any apartment rules, or disturbing other residents, neighbors, visitors, or Owner representatives. Owner may also exclude from any common area a person who refuses to show photo identification or refuses to identify himself or herself as a resident or as a guest of a specific resident in the community.

Sidewalks, steps, entrance halls, walkways and stairs shall not be obstructed or used for any purpose other than ingress or egress. Guests of Resident shall be considered a licensee for the purposes of 13-21-115, C.R.S. and any subsequent enactments.

**THERE IS NO IMPLIED COVENANT OF QUIET ENJOYMENT OR WARRANTY OF HABITABILITY OF THE APARTMENT ASSOCIATED WITH THIS LEASE. OWNER DOES NOT REPRESENT OR WARRANT THE BEHAVIOR OF ANY THIRD-PARTIES, INCLUDING OTHER RESIDENTS AND OCCUPANTS OF THE APARTMENT COMMUNITY AND DOES NOT REPRESENT THE CONDITION OF THE APARTMENT TO BE ANYTHING OTHER THAN AS IS..**

17. **PROHIBITED CONDUCT.** Resident and all occupants or guests may not engage in the following prohibited activities: loud or obnoxious conduct, including unreasonable odors; disturbing or threatening the rights, comfort, health, safety, or convenience of others in or near the apartment community, including unreasonably hostile communications with the Owner or the Owner's representatives, including unreasonable foul language; possessing, selling, or manufacturing illegal drugs or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by Colorado Law; discharging a firearm in the apartment community; displaying or possessing a gun, knife, or other weapon; acts prohibited by statute, ordinance or rules and regulations of any government entity or homeowner association; conduct which results in the issuance of a nuisance letter or notification of violation from any governmental agency; soliciting business or contributions; using the Apartment for other than residential use to include operating a business or childcare service; storing anything in closets having gas appliances; tampering with utilities; bringing hazardous materials into the apartment community; having or using glass containers in the pool area; and using candles or kerosene lamps.

18. **MOTOR VEHICLES.** Owner is not responsible for the safety of or damage to Resident's or any occupants' or guests' automobiles. Owner may regulate the time, manner, and place of parking cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles. Owner may have vehicles parked in violation of the Lease Contract, rules or posted signs towed off the premises by the Owner or hired towing company at the vehicle owner's expense, with or without prior notice. A vehicle is prohibited in the apartment community and may be immediately towed, without prior notification of any kind, if the vehicle: (1) is parked in a marked handicap space without the legally required handicap insignia; (2) blocks another vehicle from exiting; (3) is parked in a fire lane or designated "no parking" area; or (4) is parked in a space marked for other resident(s) or unit(s).

A vehicle is prohibited in the apartment community and may be towed after posting a 24-hour notice in a conspicuous place on the vehicle indicating the Owner's intent to tow said vehicle, if the vehicle: (1) is abandoned, unlicensed, derelict, inoperable; (2) has flat tires or other conditions rendering it inoperable; (3) has an expired license or inspection sticker; (4) takes up more than one parking space; (5) belongs to a Resident or occupant who has surrendered or abandoned the Apartment; or (6) is the type of vehicle prohibited below, and Resident has failed to obtain Owner's prior written consent. In the event the Owner is fined or incurs any cost associated with Resident's or any occupants' or guests' automobiles, Resident shall immediately reimburse Owner for such amounts.

Resident further agrees not to store and/or park any trailer, camper, boat, or any other similar recreational item or vehicle in the apartment community without the written consent of the Owner. Resident agrees not to store and/or park any commercial or public vehicle in the apartment community under any conditions. Resident further agrees not to make any repairs of the aforementioned motor vehicle and/or recreational items in the apartment community without the written consent of the Owner.

19. **RELEASE OF RESIDENT.** Unless Resident is given a written release, Resident shall not be released from this Lease Contract for any reason, including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary business transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment or bad health. Resident further understand that in the event that Resident dies while residing at the property, Owner shall only be obligated to release information and property as set forth in the Colorado Probate Code.

20. **RESIDENT SAFETY AND PROPERTY LOSS.** Resident and all occupants and guests must exercise due care for their own and others' safety and security, especially in the use of smoke detectors, dead bolt locks, keyless bolting devices, window latches, and other security devices.

**Smoke Detectors.** Owner will furnish smoke detectors if required by statute, and provide working batteries when Resident first takes possession. After that, Resident shall pay for and replace batteries as needed, unless the law provides otherwise. Owner may replace dead or missing batteries at Resident's expense, without prior notice to Resident. Resident must immediately report smoke-detector malfunctions to Owner. Neither Resident nor others may disconnect smoke detectors. Resident will be liable to Owner and others for any loss or damage from fire, smoke, or water if that condition is contributed to by Resident disconnecting or failing to replace batteries, or by Resident not reporting malfunctions.

**Casualty Loss.** Owner shall not liable to any Resident, guest, or occupant for personal injury or damage or loss of personal property from fire, smoke, rain, flood, environmental problems, water leaks, hail, ice, snow, lightning, wind, explosions, and interruption of utilities, unless that injury or damage is caused by Owner's negligence. Owner shall have no duty to remove any ice, sleet, or snow but may remove any amount with or without notice. Unless instructed otherwise, Resident shall, for 24 hours a day during freezing weather - (1) keep the Apartment heated to at least 50 degrees; (2) keep cabinet and closet doors open; and (3) drip hot and cold water faucets. Resident shall not leave appliances, other than furnaces or air conditioners, or water running unattended. Resident shall be liable for damage to Owner's and others' property if damage is caused by broken water pipes due to Resident's violating these requirements.

**Crime or Emergency.** Dial 911 or immediately call local fire, police, or EMS authorities in case of fire, smoke, or suspected criminal activity involving imminent harm. Resident shall then contact Owner's representative. Resident shall not treat any of Owner's security measures as an express or implied warranty of security or as a guarantee against crime or of reduced risk of crime. Any security measure undertaken by Owner shall be for the benefit of Owner and for the exclusive purpose of protecting Owner's property and shall not be relied upon by Resident. **Owner shall not be liable to Resident or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. Owner shall not be obliged to furnish security personnel, security lighting, security gates or fences, or other forms of security unless required by statute. Owner shall not be responsible for obtaining criminal-history checks on any Residents, occupants, or guests in the apartment community. If Resident or any occupant or guest is affected by a crime, Resident shall make a written report for Owner's representative and for the appropriate local law-enforcement agency. Resident shall also furnish Owner with the law-enforcement agency's incident report number upon request.**

**Registered Sex Offender List:** No person, including but not limited to Resident or any occupant, shall register the address of the Apartment on any list of registered sex offenders or predators or similar compilation. Owner does not warrant, represent nor guarantee whether other persons residing in or near the complex appear on any list of sex offenders and shall not be obligated to monitor or disseminate any compilations of registered sex offenders or other criminals. If Resident desires to obtain a copy of the list of convicted sex offenders in the area, Resident must obtain a copy from the local police, sheriff or other public record.

21. **CONDITION OF THE APARTMENT AND ALTERATIONS.** Resident accepts the Apartment, fixtures, and furniture as is. Owner disclaims all implied warranties. Within 48 hours after move-in, Resident shall advise Owner of all defects or damage. Otherwise, everything will be considered to be in clean, safe, and good working condition. Resident shall maintain and prevent the Apartment from violating any local building or housing code and shall indemnify and hold the Owner harmless from any and all claims or demands of any third-party, including any governmental authority, based on an allegation that the Apartment is in violation of a code or ordinance and shall immediately restore the Apartment to a condition that complies with the code or ordinance. Resident shall keep the Apartment free from mold and shall immediately report the presence of mold or sources of moisture to Owner.

Resident shall use customary diligence in maintaining the Apartment and common areas. Unless authorized by Owner in writing, Resident shall not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter the Apartment or the common areas. No holes or stickers are allowed inside or outside the Apartment. Owner may permit a reasonable number of small nail holes for picture hanging in sheetrock walls and grooves of wood-paneled walls. No water furniture, antennas, additional phone or TV-cable outlets, alarm systems, or lock changes, additions, or re-keying is permitted unless consented to by the Owner in writing. Resident shall not to alter or remove property, including alarm systems, smoke detectors, furniture, telephone and cable TV wiring, screens, locks, and security devices. Owner shall supply light bulbs for fixtures furnished at lease inception; after that, Resident shall replace them at Resident's expense with bulbs of the same wattage. Resident's improvements to the Apartment (whether or not Owner consents) become Owner's unless Owner agrees otherwise in writing.

22. **REQUESTS, REPAIRS, AND MALFUNCTIONS.** <u>ALL NOTICES AND REQUESTS FOR REPAIRS, INSTALLATIONS, OR SERVICES, OR SECURITY-RELATED MATTERS MUST BE IN WRITING TO THE OWNER'S DESIGNATED REPRESENTATIVE</u> (except in emergencies involving immediate danger to person or property, such as fire, gas, smoke, overflowing sewage, uncontrollable running water, electrical shorts, or crime in progress).
Owner's complying with or responding to any oral request does not waive the strict requirement for written notices under this Lease Contract. Resident shall promptly notify Owner in writing of: water leaks; electrical problems; broken or missing locks or latches; and other conditions that pose a hazard to property, health, or safety. Owner may change or install utility lines or equipment serving the Apartment if the work is done reasonably. Owner may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, Resident shall notify Owner's representative immediately. If air conditioning or other equipment malfunctions, Resident shall notify Owner's representative as soon as possible on a business day. Owner shall act with customary diligence to make repairs and reconnections, taking into consideration when casualty insurance proceeds are received. Rent will not abate. If Owner considers fire or catastrophic damage substantial, Owner may terminate this Lease Contract within a reasonable time by giving Resident written notice. If the Lease Contract is so terminated, Owner shall refund prorated rent and all deposits, less deductions.

**Initials** ________

Copyright 1997 - Colorado Apartent Association, Inc.
CAA Form 1 - Printed October 1997 (rev. 6/06)



# COLORADO APARTMENT ASSOCIATION

## SMOKE DETECTOR ADDENDUM

THIS ADDENDUM shall become a part of the lease or rental agreement ("Agreement") for Apartment No. 108 ("Unit"), at Vida LLC Apartments ("Project") between Residential Niche, Sleek lofts as "Owner", and Burton Sandles as "Resident", whether one or more.

1. **Smoke Detector.** Resident acknowledges that as of this date, the Unit is equipped with one or more smoke detectors; that Resident has inspected the smoke detector(s); and that Resident finds it/them to be in good working order.

2. **Repairs.** **RESIDENT AGREES THAT IT IS HIS/HER DUTY TO REGULARLY TEST THE SMOKE DETECTOR(S) AND AGREE TO NOTIFY OWNER IMMEDIATELY IN WRITING OF ANY PROBLEM, DEFECT, MALFUNCTION OR FAILURE OF THE SMOKE DETECTOR(S). WITHIN SEVEN (7) DAYS OF RECEIPT OF SUCH WRITTEN NOTIFICATION BY OWNER, OWNER SHALL REPAIR OR REPLACE THE SMOKE DETECTOR(S), ASSUMING THE AVAILABILITY OF LABOR AND MATERIALS. RESIDENT AGREES TO ALLOW THE OWNER TO INSPECT AND TEST THE SMOKE DETECTOR(S) EVERY SIX MONTHS.**

3. **Maintenance.** **RESIDENT AGREES TO NOTIFY THE OWNER IF AT ANY TIME THE EXISTING BATTERY BECOMES UNSERVICEABLE.**

4. **Replacement.** **RESIDENT AGREES TO REIMBURSE OWNER, UPON REQUEST, FOR THE COST OF A NEW SMOKE DETECTOR(S) AND THE INSTALLATION THEREOF IN THE EVENT THE EXISTING SMOKE DETECTOR(S) BECOMES DAMAGED BY RESIDENT OR RESIDENT'S GUESTS OR INVITEES.**

5. **Entire Agreement.** The parties hereto acknowledge that this written addendum is the entire agreement of the parties relative to the smoke detector(s) in the above referenced unit. Any agreement that in any way varies the terms of this Addendum shall be unenforceable and completely void unless such agreement is in writing and signed by both parties. This Addendum is valid only for members of the COLORADO APARTMENT ASSOCIATION.

6. **Term.** The term of this Addendum shall be the same term as Agreement or any renewal or extension of Agreement.

Executed this 10th day of November, 09.

**Resident(s)**
**(All residents must sign)**

[signature] 11/10/09

Owner or Owner's Representative

[signature]

**PLEASE READ THIS ADDENDUM, IT PLACES A DUTY UPON THE RESIDENT TO REGULARLY TEST THE SMOKE DETECTOR(S) AND TO REPORT ALL MALFUNCTIONS OF THE SAME TO THE OWNER IN WRITING.**

©Copyright 1990, Colorado Apartment Association, Inc.



# Mold Addendum

This Mold Addendum is made 11/6/09 (date) by Vida LLC ("Owner") and Burton Sanches ("Resident") and made part of that CAA Apartment Lease of even date herewith (the "Lease"). Except as specifically modified by this Mold Addendum, the terms of the Lease and any other attachments thereto shall remain in full force and effect.

**Resident Obligations Regarding Mold**

Resident shall keep the apartment, particularly the kitchen, bathroom(s), carpets and floors, clean through regular vacuuming, moping and use of household cleaners on hard surfaces.

Resident shall immediately and consistently remove all visible moisture from all surfaces in the apartment.

Resident shall periodically inspect all sinks, bathtubs, toilets, shower enclosures, refrigerators, dishwashers, water heaters, washing machines, dryers, humidifiers, dehumidifiers and air conditioners and the connections, discharge lines and the areas surrounding each, to ascertain whether there are any water leaks or signs of water leaks.

Resident shall immediately inform Owner in writing of any water leaks or signs of water leaks as well as any missing grout or calk in tiled areas.

Resident shall reasonably prevent and shall immediately clean and dry all plant watering overflows, beverage spills, cooking spills, pet urination, and overflows from fixtures and appliances.

Resident shall ensure that all shower doors and curtains are utilized to prevent water from escaping any tub or shower enclosure.

Resident shall not allow damp clothes and towels to accumulate and shall consistently hang towels on towel racks to allow them to dry.

Resident shall keep all windows and doors closed during adverse weather and when the apartment is unattended.

In the event of visible accumulation of mold on hard surfaces, Resident shall immediately clean the accumulated and surrounding area with soap or detergent and allow the area to dry. Within 24 hours of the initial cleaning, resident shall apply a spray on type biocide (such as Lysol Disinfectant or Pine-Sol Disinfectant) in accordance with the product's instructions and labeling.

Resident shall place and store Resident's personal property to prevent it from becoming wet or damaged in the event of water leakage, backup or flooding.

**Owner Obligations Regarding Mold:**

Upon written notification by resident, Owner shall within a reasonable time, repair water leaks in the apartment, provided such leaks are not caused by the misuse use or neglect of Resident, or any Occupants, guest or invites of Resident, or by any violation of the Lease or this Mold Addendum by Resident, or any Occupants, guest or invites of Resident.

Upon written notification by resident, Owner shall within a reasonable time, clean or apply biocides to visible mold on porous surfaces such as sheetrock walls and ceilings, provided such visible mold has not been caused by the misuse use or neglect of Resident, or any Occupants, guest or invites of Resident or by any violation of the Lease or this Mold Addendum by Resident, or any Occupants, guest or invites of Resident.

**Remedies:**

Owner does not warrant or represent that the apartment shall be free from mold.

A breach of this Mold Addendum by Resident shall be a material violation of the Lease allowing Owner to recover possession of the apartment, following Demand for Possession or Compliance in accordance with state law, and all other rights and remedies contained in the Lease.

In the event of a breach of this Mold Addendum by Owner, Resident's sole and exclusive remedy shall be to immediately vacate the apartment and Resident's obligations to continue to pay rent shall terminate on the date Resident delivers possession of the apartment to Owner. Owner shall in no event be liable for consequential damages such as damages to Resident's personal property, or claims of adverse health conditions associated with exposure to mold.

**Warranties, Indemnifications and Releases:**

Resident hereby indemnifies and shall hold Owner harmless from any and all claims or causes of action, arising (in whole or in part) from Resident's breach of the obligations contained in this Mold Addendum.

Resident hereby releases Owner from any and all claims of Resident or Occupant for the presence of mold in the apartment, other than claims based on breach of this Mold Addendum by Owner and further releases Owner from any and all claims of consequential damages such as damages to Resident's personal property, or claims of adverse health conditions associated with exposure to mold.

Owner: [signature]

By: ______________________

Resident: [signature]

11/6/09

©Copyright 2002, Colorado Apartment Association, Inc.



 

# COLORADO APARTMENT ASSOCIATION

## SECURITY DEPOSIT ADDENDUM

The undersigned Broker or his agent, and the Resident hereby acknowledge that the Broker is acting as agent for the owner of the property described in that certain lease agreement between the parties dated November 10th, 2009.

The Resident understands and agrees that the security deposit called for in that lease agreement will be held by the owner whose name and address are:

Residential Niche
3130 W. Louisiana Ave #102
Denver, CO 80219

Resident further agrees that in the event of a dispute regarding the disposition of the security deposit at the end of the lease term, Resident shall look solely to the owner for redress of any remedies he may then have and hereby releases the Broker from any and all liability which may arise due to the disposition of that deposit.

[signature] Date: 11/10/09
Broker/Agent

[signature] Date: 11/9/09
Resident

______________________ Date: ____________
Resident

CAA FORM 8, May 1990
Forms available from Apartment Association of Metro Denver

©Copyright 1990, Colorado Apartment Association, Inc.

# COMMUNITY POLICES, RULES AND REGULATIONS ADDENDUM

*This addendum is incorporated into the Lease Contract (the "Lease") identified fellow and is in addition to all the terms and conditions contained in the Lease. If any terms of this Addendum conflict with the Lease, the terms of this Addendum shall be controlling.*

*Property Owner:* Vida LLC
*Resident(s):* Burton Sandles
*Apartment Community* Vida LLC
*Lease Date:* November 6, 2009

1. **GENERAL CONDITIONS FOR USE OF APARTMENT PROPERTY AND RECREATIONAL FACILITIES.**
Resident(s) permission for use of all common areas, Resident amenities, and recreational facilities (together, "Amenities") located at the Apartment Community is a privilege and license granted by Owner, and not a contractual right except as otherwise provided for in the Lease. Such permission is expressly conditioned upon Resident's adherence to the terms of the Lease , this Addendum, and the Community rules and regulations ("Rules") in effect at any given time, and such permission may be revoked by Owner at any time for any lawful reason. In all cases, the most strict terms of either the Lease, this Addendum, or the Community Rules shall control. Owner reserves the right to set the days and hours of use for all Amenities and to the change the character of or close any Amenity based upon the needs of Owner and in Owner's sole and absolute discretion, without notice, obligation or recompense of any nature to Resident. Owner and management may make changes to the Rules for use of any Amenity at any time.
**Additionally, Resident(s) expressly agrees to assume all risks of every type, including but not limited to risks of personal injury or property damage, of whatever nature of severity, related to Resident's use of the amenities at the Community. Resident(s) agrees to hold Owner harmless and release and waive any and all claims, allegations, actions, damages, losses, or liabilities of every type, whether or not foreseeable, that Resident(s) may have against Owner and that are in any way related to or arise from such use. This provision shall be enforceable to the fullest extent of the law.**
**THE TERMS OF THIS ADDENDUM SHALL ALSO APPLY TO RESIDENT(S)' OCCUPANTS, AGENTS AND INVITEES TOGETHER WITH THE HEIRS, ASSIGNS, ESTATES AND LEGAL REPRESENTATIVES OF THEM ALL, AND RESIDENT(S) SHALL BE SOLELY RESPONSIBLE FOR THE COMPLIANCE OF SUCH PERSONS WITH THE LEASE, THIS ADDENDUM AND COMMUNITY RULES AND REGULATIONS , AND RESIDENT(S) INTEND TO AND SHALL INDEMNIFY AND HOLD OWNER HARMLESS FROM ALL CLAIMS OF SUCH PERSONS AS DESCRIBED IN THE PRECEDING PARAGRAPH. The term "Owner" shall include the Management, officers, partners, employees, agents, assigns, Owners, subsidiaries affiliates of Owner.**

2. **BILLIARDS TABLE.** This Community ___ **DOES;** _X_ **DOES NOT** have a billiards table. When use

- No Running or roughing around the equipment
- No abusing or misuse of billiard equipment
- No setting any food or beverages of any kind on billiard table
- Resident(s) must accompany guests at all times
- Resident must notify owner at any time there is a problem or safety hazard in the billiards area

3. **BUSINESS CENTER.** This Community _X_ **DOES;** __ **DOES NOT** have a business center. Resident(s) agrees to use the business center at Resident(s) sole risk and according to the Community Rules. Owner is not responsible for data, files, programs or any other information lost or damaged on Business Center computers or in the Business Center for any reason. No software may be loaded on Business Center computers without the written approval of Community Management. No inappropriate, offensive, or pornographic images or files (in the sole judgment of Owner) will be viewed or loaded onto the Business Center computers at any time. Residents will limit time on computers to 20 minutes if others are waiting to use them. Smoking, eating, alcoholic beverages, pets, and any disturbing behavior are prohibited in the business center. Children under the age of 14 must be accompanied by a Resident who is that child's parent or legal guardian.

4. **AUTOMOBILES/BOATS/RECREATIONAL VEHICLES.** The following policies are in addition to those in the Lease, and may be modified by the additional rules in effect at the Community at any given time:

- Only 1 vehicle per licensed Resident is allowed.
- All vehicles must be registered at the Management office.
- Any vehicle(s) not registered, considered abandoned, or violating the Lease, this Addendum, or the Community Rules, in the sole judgment of Management, will be towed at the vehicle owner's expense after a _0_ hour notice is placed on the vehicle.
- Notwithstanding this, any vehicle illegally parked in a fire lane, designated no parking space or handicapped space, or blocking an entrance, exit, driveway, dumpster, or parked illegally in a designated parking space, will immediately be towed, without notice, at the vehicle owner's expense.
- The washing of vehicles is not permitted on the property unless specifically allowed in a designated area.
- Any on-property repairs and/or maintenance of any vehicle must be with the prior written permission of the Management.
- Recreational vehicles, boats or trailers may only be parked in the area(s) designated by Management.

5. **FIRE HAZARDS.** In order to minimize fire hazards and comply with city ordinances., Resident shall comply with the following;

- Residents and quests will adhere to the Community rules and regulations other Management policies concerning fire hazards, which may be revised from time to time.
- No person shall knowingly maintain a fire hazard.
- Flammable or combustible liquids and fuels shall not be used or stored (including stock for sale) in apartments, near exits, stairways, or areas normally used for the ingress and egress of people. This includes motorcycles and any apparatus or engine using flammable or combustible liquid as fuel.
- No person shall block or obstruct any exit, aisle, passageway, hallway or stairway leading to or from any structure.
- Resident(s) are solely responsible for fines or penalties caused by their actions in violation of local fire protection codes.

6. **EXTERMINATING.** Unless prohibited by statue or otherwise stated in the Lease, Owner may conduct extermination operations in Residents' apartment several times a year and as needed to prevent insect infestation. Owner will notify Residents in advance of extermination in Resident's Apartment, and give Resident instructions for the preparation of the Apartment and safe contact with insecticides. Residents will be responsible to prepare the Apartment for extermination in accordance with Owner's instructions. If Residents are unprepared for a scheduled treatment date Owner will prepare Residents' apartment and charge Residents accordingly. Residents must request extermination treatments in addition to those regularly provided by Owner in writing. **Residents agree to perform the tasks required by Owner on the day of interior extermination to ensure the safety and effectiveness of the extermination. These tasks will include, but are not limited to, the following:**
   - Clean in all cabinets, drawers and closets in kitchen and pantry
   - If roaches have been seen in closets remove contents from shelves and floor.
   - Remove infants and young children from the apartment
   - Remove pets or place them in bedrooms, and notify Owner of such placement.
   - Owner is not to be held responsible for illness sustained to pets or children due to any exterminating means.
   - Remove chain locks or other types of obstruction on day of service.
   - Cover fish tanks and turn off their air pumps.
   - Do not wipe out cabinets after treatment.
   - If you are not ready for exterminating YOU WILL BE FINED 125.00 EACH OFFENSE!

   **RESIDENTS ARE SOLELY RESPONSIBLE TO NOTIFY OWNER IN WRITING PRIOR TO EXTERMINATION OF ANY ANTICIPATED HEALTH OR SAFETY CONCERNS RELATED TO EXTERMINATION AND THE USE OF INSECTICIDES**

7. **DRAPES AND SHADES.** Drapes or shades installed by Resident, when allowed, must be lined in white and present a uniform exterior appearance.

8. **WATER BEDS.** Resident shall not have water beds or other water furniture in the apartment without prior written permission of Owner.

9. **SIGNS.** Resident shall not display any signs, exterior lights or markings on apartment. No awnings or other projections shall be attached to the outside of the building of which apartment is a part.

10. **WAIVER/SEVERABILITY CLAUSE.** No waiver of any provision herein, or in any Community rules and regulations, shall be effective unless granted by the Owner in a signed and dated writing. If any court of competent jurisdiction finds that any clause, phrase, or provision of this Part is invalid for any reason whatsoever, this finding shall not effect the validity of the remaining portions of this addendum, the Apartment Lease Contract or any other addenda to the Apartment Lease Contract.

**I have read, understand and agree to comply with the preceding provisions.**

| | |
|---|---|
| [signature] **Resident** | [signature] **Owner (or Owner's Representative)** |
| [signature] 11/6/09 **Resident's Signature** **Date** | Tiara Schu[signature] 11/6/09 **Owner's Signature** **Date** |
| **Resident** | |
| **Resident's Signature** **Date** | |

Vida, LLC

Community Policies Addendum

I have read and will follow all community policies. I understand that any violation of the community policies can result in termination of my lease. I understand that if any minors/outside guests violate any community policies, I the resident, am responsible and actions/terminations of lease can occur.

Resident Signature: [signature] Date 11/5/08

Resident Signature: [signature] Date 11/5/08

Colorado Coalition for The Homeless
25 East 16th Street; Box #4
Denver, Colorado 80202

Nicholas Layton
Case Manager:

Dear Mr. Layton & Mr. Ginsberg:

Please accept this letter as your formal written notification that I, Burton Sandles, previous client, does hereby formally request that the original Lease which is contained in my file with your coalition be mailed to me at the below address:

Burton Sandles
1746 Emerson Street #103
Denver, Colorado 80218

The particular lease in question is the lease which was signed by your previous Housing Case manager; Doris ............ at the Vida Apartment Complex on Colorado Boulevard, during my brief tenancy there at your insistence. Eviction proceedings were precipitated against me at that complex [VIDA], for which I spent 11 months in Jail, all cases dismissed, (see Enclosed).

Therefore I am hereby formally requesting to be sent to me at the above address the original lease, or copy thereof to the address above as all of my apartment furnishings were sold at sheriffs sale, with no notification of eviction proceedings, and or no submissions of writs of restitution that were sent to me either by that Complex; [Vida], Colorado Boulevard, or by yourself [Colorado Coalition for the Homeless] acting in the capacity as my payee during this wrongful eviction and prosecution.

Sincerely,

Burton Sandles, Previous Client
BS:bs

Colorado Coalition for The Homeless
25 East 16th Street; Box #4
Denver, Colorado 80202

Nicholas Layton
Case Manager:

Dear Mr. Layton & Mr. Ginsberg:

Please accept this letter as your formal written notification that I, Burton Sandles, previous client, does hereby formally request that the original Lease which is contained in my file with your coalition be mailed to me at the below address:

Burton Sandles
1746 Emerson Street #103
Denver, Colorado 80218

The particular lease in question is the lease which was signed by your previous Housing Case manager; Doris ............ at the Vida Apartment Complex on Colorado Boulevard, during my brief tenancy there at your insistence. Eviction proceedings were precipitated against me at that complex [VIDA], for which I spent 11 months in Jail, <u>all cases dismissed, (see Enclosed).</u>

Therefore I am hereby formally requesting to be sent to me at the above address the original lease, or copy thereof to the address above as <u>all of my apartment furnishings were sold at sheriffs sale,</u> with no notification of eviction proceedings, and or no submissions of writs of restitution that were sent to me either by that Complex; [Vida], Colorado Boulevard, or by yourself [Colorado Coalition for the Homeless] acting in the capacity as my payee during this wrongful eviction and prosecution.

Sincerely,

Burton Sandles, Previous Client
BS:bs

## Case Information

DCC Case No: 10GS229061 State Case No: C1162010M 229061

| Status | Case Type | Vio Date | Date Filed | DV | Citation Pfx |
|---|---|---|---|---|---|
| CLOSED | DISTURBANCE | 01/12/2010 | 01/14/2010 | N | GD |

Location: 3773 CHERRY CREEK DR N

## Party Information

DCC Case No: 10GS229061 **1 Party**

DEFENDANT

| Last Name | First Name | MI | Suffix | DOB | Party Status |
|---|---|---|---|---|---|
| SANDLES | BURTON | A | | 11/12/1955 | |

Address: 1151 N COLORADO BLVD #108
DENVER, CO

## Violations

DCC Case No: 10GS229061

| | Disposition | CRS | Class | Description | Points |
|---|---|---|---|---|---|
| 1 | DISMISSED | 38-32(a) | UC | RESISTANCE TO POLICE AUTHORITY | 0 |
| 2 | DISMISSED | 38-89(a) | UC | DISTURBING THE PEACE | 0 |
| 3 | DISMISSED | 38-92(a) | UC | THREATS TO PERSON/PROPERTY | 0 |
| 4 | DISMISSED | 38-115(a) | UC | TRESPASS | 0 |

## Action Information

DCC Case No: 10GS229061

| Date | Action | Judicial Officer | Crtrm | Dispo | Amount |
|---|---|---|---|---|---|
| 06/10/10 08:30 | DEAD JACKET | | 151P | | |
| 06/10/10 08:30 | REVIEW DATE | Judge L Bohning | 151P | DISMISSED ON MOTION OF CA | |
| 05/03/10 08:30 | JURY TRIAL | Judge L Bohning | 151P | VACATE COURT DATE | |
| 04/28/10 08:30 | REVIEW DATE | Judge L Bohning | 151P | CONTINUED BY DEFENDANT | |
| Minute #1 | CASE CALLED ON RECORD. DEF NOT PRESENT. DEF COUNSEL MYRICK PRESENT & WAIVES APPEARANCE OF DEF - CA BEATO PRESENT - DEF COUNSEL MYRICK STATES ISSUE OF DEF'S COMPETENCY WAS JUST RAISED IN DENVER DISTRICT COURT ON 04/07/10 & IS STILL PENDING - ON M/DEF | | | | |
| Minute #2 | COUNSEL K TO 06/10/10 FOR STATUS REVIEW HRNG (AWAITING COMPETENCY EVALUATION OF DEF). LLB/KYW | | | | |
| 04/23/10 08:30 | MISCELLANEOUS HEARING | Judge L Bohning | 151P | SET NEW COURT DATE | |
| Minute #1 | CASE CALLED ON RECORD ON M/COURT. DEF COUNSEL BAILEY & CA GADDIS PRESENT. CA STATES CA HAS RECEIVED COPY OF DEF'S MOTION TO SUSPEND ALL PROCEEDINGS & DETERMINE COMPETENCY TO PROCEED TO TRIAL. ON M/DEF VACATE J/T & K & RESET FOR STATUS REVIEW HRNG | | | | |
| Minute #2 | 04/28/10 (TO DETERMINE STATUS OF DEF'S IN DENVER DISTRICT COURT). LLB/KYW | | | | |
| 04/22/10 09:17 | MOTION FILED | | 151P | | |
| Minute #1 | MOTION TO SUSPEND ALL PROCEEDINGS AND DETERMINE COMPETENCY TO PROCEED TO TRIAL FILED 04/22/10. TMA FILED BY COUNSEL BAILEY | | | | |
| 03/08/10 08:30 | SPEEDY TRIAL WAIVED | | 151P | | |
| 03/08/10 08:30 | JURY TRIAL | Judge L Bohning | 151P | CONTINUED BY DEFENDANT | |
| Minute #1 | DEFR I/C COUNSEL DEATSCH & CA REYNOLDS READY - 2 C DEF'S MT FOR ADDITIONAL DISCOVERY FILED - K ON M/DEF - NO OBJECTION - DEF WAIVES - LLBCMS | | | | |
| 02/03/10 10:00 | MISCELLANEOUS HEARING | Judge L Bohning | 151P | SET NEW COURT DATE | |
| Minute #1 | DEF I/C - COUNSEL MYRICK - CA REYNOLDS - STIP BOND REDUCED TO $1000 - ON M/CA NCO/PO ISSUED IN FAVOR OF STACIE FARE & 3773 CHERRY CREEK DRIVE NORTH DENVER | | | | |
| 02/03/10 09:05 | PROTECTION ORDER | | 151P | | |
| 02/03/10 09:03 | BOND REDUCED | | 151P | | 1,000.00 |
| 02/02/10 10:00 | MISCELLANEOUS HEARING | Judge L Bohning | 151P | CONTINUED BY DEFENDANT | |
| Minute #1 | A.M. CASE CALLED ON RECORD - DEF PRESENT I/C - COUNSEL BAILEY NOT PRESENT - CA REYNOLDS - ON M/DEF K MISC HRG TO 2/3/10 FOR COUNSEL BAILEY TO BE PRESENT | | | | |
| Minute #2 | *DEF TO BE ORDERED IN** LLB/CMS MITT WAS SENT UP W/ KIM - CMS | | | | |
| 01/29/10 10:02 | JURY FEE WAIVED | | 151P | | |
| 01/29/10 08:30 | IN CUSTODY HEARING | Judge L Bohning | 151P | SET NEW COURT DATE | |
| Minute #1 | DEF I/C - COUNSEL L. BAILEY - CA REYNOLDS. SET FOR J/T (S/T=04/21/10) JURY FEE WAIVED - ON M/DEF SET FOR BOND HRNG 02/02/10. LLB/KYW | | | | |

## Action Information

DCC Case No: 10GS229061

| Date | Action | Judicial Officer | Crtrm | Dispo | Amount |
|---|---|---|---|---|---|
| 01/28/10 08:30 | DISPOSITION/RESET DATE | Judge L Bohning | 151P | SET NEW COURT DATE | |
| Minute #1 | DEF I/C - PD NORMAN - CA REYNOLDS. MOTION BY PD NORMAN TO WITHDRAW & APPT CONFLICT COUNSEL GRANTED. K TO 01/29/10 FOR I/C HRNG (FOR CONFLICT COUNSEL TO | | | | |
| Minute #2 | BE PRESENT). LLB/KYW | | | | |
| 01/22/10 08:00 | BOND SET | | 12T | | 4,000.00 |
| 01/22/10 08:00 | ARRAIGNMENT | Judge A Rudolph | 12T | NOT GUILTY PLEA SET DISPO HRG. | |
| 01/21/10 09:19 | DEFENDANT NOT BROUGHT IN | | 12T | | |
| 01/21/10 08:00 | ARRAIGNMENT | Judge A Rudolph | 12T | CONTINUED BY COURT | |
| 01/20/10 09:17 | DEFENDANT NOT BROUGHT IN | | 12T | | |
| 01/20/10 08:00 | ARRAIGNMENT | Judge A Rudolph | 12T | CONTINUED BY COURT | |
| 01/19/10 11:20 | DEFENDANT NOT BROUGHT IN | | 12T | | |
| 01/19/10 08:00 | ARRAIGNMENT | Judge J Breese | 12T | CONTINUED BY COURT | |
| 01/17/10 09:00 | ARRAIGNMENT | Judge J Breese | 12T | DEFENDANT NOT BROUGHT IN | |
| 01/16/10 09:00 | ARRAIGNMENT | Judge J Breese | 12T | DEFENDANT NOT BROUGHT IN | |
| 01/16/10 08:00 | ARRAIGNMENT | Judge A Rudolph | 12T | VACATE COURT DATE | |
| 01/15/10 08:00 | ARRAIGNMENT | Judge A Rudolph | 12T | DEFENDANT NOT BROUGHT IN | |
| 01/14/10 13:30 | ARRAIGNMENT | Judge A Rudolph | 12T | CONTINUED BY COURT | |
| 01/14/10 07:13 | CASE ENTERED | | | | |
| 01/12/10 00:00 | DENVER CITY JAIL IN CUSTODY | | | | |

## Jail Information

DCC Case No: 10GS229061

| Date | Location | Arrest No |
|---|---|---|
| 01/12/2010 | DENVER CITY JAIL IN CUSTODY | |

## Official Information

DCC Case No: 10GS229061

**ID:** P00004 **Name:** VIGIL, MARCUS

**ID:** P90018 **Name:** INNES, GREGORY

Printed: 11/07/11 9:45 AM **Case Number : 10M00855** Page 1 of 1

## Case Information

DCC Case No: 10M00855 State Case No: C0862010M 000855

| Status | Case Type | Vio Date | Date Filed | Trial Ctrm | DV |
|---|---|---|---|---|---|
| CLOSED | | 01/12/2010 | | | |

Location:

## Party Information

DCC Case No: 10M00855 **1 Party**

DEFENDANT

| Last Name | First Name | MI | Suffix | DOB | Party Status |
|---|---|---|---|---|---|
| SANDLES | BURTON | A | | 11/12/1955 | CLEAR |

Address: Phone:

, CO

## Violations

DCC Case No: 10M00855

| | Disposition | CRS | Class | Description | Points |
|---|---|---|---|---|---|
| 1 | | 18-3-404(1)(a) | M1 | SEXUAL CONTACT-NO CONSENT | 0 |
| 2 | | 00-000-0000 | UC | ERROR CODE - ENTRY BY OFFICER | 0 |

## Action Information

DCC Case No: 10M00855

| Date | Action | Judicial Officer | Crtrm | Dispo | Amount |
|---|---|---|---|---|---|
| 01/22/10 08:28 | CASE CLOSED | | | | |
| Minute #1 | DROPPED. REFER TO 10M00790. KKH 01-22-2010 | | | | |
| 01/16/10 10:00 | 1ST ADVISEMENT | Judge J Breese | 12T | CONTINUE BY COURT | |
| 01/16/10 09:15 | BOND SET | | 12T | —— | 3,000.00 |
| 01/16/10 09:15 | DEFENDANT NOT BROUGHT IN | | 12T | | |
| 01/16/10 06:18 | PRE-CASE ENTERED | | | | |
| 01/12/10 00:00 | DENVER CITY JAIL IN CUSTODY | | | | |

## Jail Information

DCC Case No: 10M00855

| Date | Location | Arrest No |
|---|---|---|
| 01/12/2010 | DENVER CITY JAIL IN CUSTODY | |

## Action Information

DCC Case No: 10M00790

| Date | Action | Judicial Officer | Crtrm | Dispo | Amount |
|---|---|---|---|---|---|
| 03/19/10 08:30 | DISPOSITION/RESET DATE | Judge R Crew | 186L | CONTINUE BY DEFENDANT | |
| Minute #1 | JUDGE CJJ: [CONT/D], Set MOTNH | | | | |
| 03/16/10 16:22 | MOTION FILED | | 186L | | |
| Minute #1 | MOTION FOR NOTICE OF INTRODUCTION OF SIMILAR TRANSACTIONS--QRS | | | | |
| 02/23/10 16:31 | MOTION FILED | | | | |
| Minute #1 | MOTION FOR NOTICE OF INTRODUCTION OF SIMILAR TRANSACTIONS. JLG | | | | |
| 02/23/10 16:30 | SUPRESS MOTION FILED | | | | |
| 02/23/10 16:30 | MISC. CORRESPONDENCE RECEIVI | | | | |
| 02/17/10 16:11 | ENTRY OF APPEARANCE | | | | |
| 02/03/10 09:36 | BOND REDUCTION DENIED | | 186L | | |
| 02/03/10 08:30 | IN CUSTODY HEARING | Judge C Jordan | 186L | CONTINUE BY DEFENDANT | |
| Minute #1 | JUDGE CJJ: [CONT/D], Set DISTRL, BOND REDUCTION DENIED | | | | |
| 01/27/10 08:30 | IN CUSTODY HEARING | Judge C Jordan | 186L | NOT GUILTY PLEA SET NEW DATE | |
| Minute #1 | ked 1 week for br CJJ | | | | |
| Minute #2 | JUDGE CJJ: [NGSET], Set INCUS | | | | |
| 01/27/10 00:00 | SPEEDY TRIAL STARTS | | | RESET | |
| 01/22/10 14:11 | CONSENT TO MAGISTRATE | | | | |
| 01/22/10 13:30 | BOND SET | | 124D | | 10,000.00 |
| 01/22/10 13:30 | PROTECTION ORDER | | 124D | | |
| 01/22/10 13:30 | ARRAIGNMENT | Magistrate M Muller | 124D | DEFENDANT ADVISED | |
| Minute #1 | JUDGE MRM: [DEFADV], Set INCUST, BOND SET-$10000.00, Issue PO, Consent to Magistrate | | | | |
| 01/21/10 13:30 | ARRAIGNMENT | Magistrate M Muller | 124D | VACATE COURT DATE | |
| 01/20/10 13:30 | ARRAIGNMENT | Magistrate M Muller | 124D | VACATE COURT DATE | |
| 01/19/10 13:30 | ARRAIGNMENT | Magistrate M Muller | 124D | VACATE COURT DATE | |
| 01/19/10 08:49 | CASE ENTERED | | | | |
| 01/15/10 10:00 | 1ST ADVISEMENT | Judge A Rudolph | 12T | CONTINUE BY COURT | |
| 01/14/10 15:07 | MOTION GRANTED | | 12T | | |
| 01/14/10 15:07 | E-MOTN TO ENLARGE TIME TO FILE | | 12T | | |
| 01/14/10 10:00 | 1ST ADVISEMENT | Judge A Rudolph | 12T | CONTINUE BY COURT | |
| 01/14/10 06:57 | PRE-CASE ENTERED | | | | |
| 01/12/10 00:00 | DENVER CITY JAIL IN CUSTODY | | | | |

## Jail Information

DCC Case No: 10M00790

| Date | Location | Arrest No |
|---|---|---|
| 01/12/2010 | DENVER CITY JAIL IN CUSTODY | |

## Official Information

DCC Case No: 10M00790

| ID | Name |
|---|---|
| P00004 | VIGIL, MARCUS |
| P00037 | BUENO, ERIC |
| P86057 | SMITH, KEVIN |
| P90018 | INNES, GREGORY |
| P94024 | EDWARDS, TROY |

Residential Lease SHP Housing Program

1. Parties, Dwelling Unit and Rent

The parties to this agreement are Vida LLC,

referred to as the "Landlord", and Burton Sandles,

referred to as the "Tenant." This agreement is entered into on November 6

20 09. The Landlord leases to the tenant the following dwelling unit:

1151 Colorado Blvd. #108 Denver CO 80206

The members of the Tenant's family who will reside in the unit are: none

______________________________________.

The monthly rent is $ 728.06

2. Required Provisions

(A) Supportive Housing Voucher Contract

The Landlord will enter into a SHP Voucher Contract with The Colorado Coalition for the Homeless under the combined initials of the U.S. Department of Housing and Urban Development (H.U.D.) SHP. Under the Contract, CCH will make housing assistance payments to the Landlord to assist the Family of which Tenant is the legal representative ("Tenant Family"), to lease the dwelling unit from the landlord.

(B) Conflict with Other Provisions of the Lease

In Case of any conflict between the provisions of this Section 2 of the Lease and any other provisions of the Lease, the provisions of this Section 2 shall prevail.

(C) Term of Lease

The term of the Lease shall be for 12 months and begin on 11/6/09 and shall continue until (1) a termination of the Lease by the Landlord in accordance with paragraph (H) of this section, or (2) a termination of the Lease by the Tenant in accordance with the Lease or by mutual agreement during the term of the Lease.

(D) Housing Assistance Payment

Each month the CCH will make a housing assistance payment to the Landlord on behalf of the Tenant Family in accordance with the SHPVoucher Contract. The monthly housing assistance payment by CCH shall be credited by the Landlord toward the monthly rent payable by the Tenant to the Landlord under this Lease. The balance of the monthly rent shall be paid by the Tenant. Any changes in the amount of the tenant rent will be effective on the date stated in a notification by CCH to the family and the Owner. Initially and until such change the Family shall pay $ 192.06 per month to the Owner as the tenant rent.

(E) Security Deposit

(1) The Tenant has deposited $ 700.00 with the Landlord as a security deposit. The Landlord will comply with HUD regulations regarding security deposits from a Tenant, and shall not collect a security deposit which is more than the maximum amount permitted under the regulations.

The Landlord will hold this security deposit during the period the Tenant Family occupies the dwelling unit under the Lease. The Landlord shall comply with State and local Laws regarding interest payments on security deposits.

(2) After the Tenant Family has moved from the dwelling unit, the Landlord may, subject to State and local law, use the security deposit, including any interest on the deposit, as reimbursement for any rent payable by the Tenant or other amounts which the Tenant owes under the Lease. The Landlord will give the Tenant a written list of all items charged against the security deposit and the amount of each item. After deducting the amount used as reimbursement to the Landlord, the Landlord shall promptly refund the full amount of the balance to the Tenant.

(F) Utilities and Appliances

(1) The Landlord shall provide the utilities listed in column (1) below for the dwelling unit without any additional charge to the Tenant. The utilities listed in column (2) are not included in the rent, and are paid by the Tenant.

| Type of Utility | Column 1 Put "x" by Utility Included in Rent | Column 2 Put "x" by Tenant Paid Utility |
|---|---|---|
| Garbage collection | X | |
| Water | X | |
| Heating (specify type) Natural Gas | X | |
| Lights (electric) | X | |
| Cooking (specify type) Electric | X | |
| Other (specify) | | |
| | | |
| | | |

(2) (i) The range for the dwelling unit shall be provided by the Landlord. (Insert Landlord or Tenant, as appropriate. If unspecified, the range shall be provided by the Landlord.)

(ii) The refrigerator for the dwelling unit shall be provided by the Landlord. (Insert Landlord or Tenant, as appropriate. If unspecified, the refrigerator shall be provided by the Landlord).

(3) The Landlord shall provide the following other appliances for the dwelling unit:
dishwasher

(G) Maintenance and Services

The Landlord shall maintain the dwelling unit, equipment and appliances, and common areas and facilities, in accordance with the HUD Housing Quality Standards for the Housing Voucher Program, including the provision of all the services, maintenance and utilities as agreed to in this Lease.

(H)Termination of Tenancy

(1) The Landlord shall not terminate the tenancy except for:

(i) Serious or repeated violation of the terms and conditions of the Lease;

(ii) Violation of Federal, State, and local law which imposes obligations on a tenant in connection with the occupancy or use of the dwelling unit and surrounding premises; or

(iii) Other good cause. However, during the first year of the term of the Lease, the Owner may not terminate the tenancy for "other good cause" unless the termination is based on malfeasance or nonfeasance of the Tenant Family.

(2) The following are some examples of "other good cause" for termination of tenancy by the Landlord:

(i) Failure by the Tenant Family to accept the offer of a new Lease in accordance with paragraph (K) of this section;

(ii) A Tenant Family history of disturbance of neighbors or destruction of property, or of living or housekeeping habits resulting in damage to the unit or property;

(iii) Criminal activity by Tenant Family members involving crimes of physical violence to persons or property;

(iv) The Landlord's desire to utilize the unit for personal or family use or for a purpose other than use as a residential rental unit; or

(v) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, desire to rent the unit at a higher rental).

(3) This list of examples is intended as a non-exclusive statement of some situations included in "other good cause," but shall in no way be construed as a limitations on the application of "other good cause" to situations not included in the list. The Owners may not terminate the tenancy during the first year of the term of the Lease for "other good cause" (see paragraph (H)(1)(iii), for the grounds stated in paragraph (H)(2)(i), (H)(2)(iv), or (H)(2)(v) of this section.

(4) The Landlord may evict the Tenant from the unit only by instituting a court action. The Landlord must notify CCH in writing of the commencement of procedures for termination of tenancy, at the same time that the Landlord gives notice to the Tenant under State or local law. The notice to CCH may be given by furnishing to CCH a copy of the notice to the Tenant.

(I) The Landlord shall not discriminate against the Tenant Family in the provision of services, or in any other manner, on the grounds of age, race, color, creed, religion, sex, disability or national origin.

(J) Any notices required under paragraphs (H), (K) or (L) of this section may be combined with and run concurrently with any notice required under State and local law.

(K) After approval of a proposed new Lease by CCH in accordance with HUD regulations, the Landlord may offer the Tenant Family the proposed new Lease for execution on behalf of the Tenant Family, for a term beginning at any time after the first of the year of the term of this Lease. The Landlord shall give the Tenant written notice of the offer, with a copy to CCH, at least sixty days before the proposed commencement date of the new Lease term. The offer may specify a reasonable time limit for acceptance by the Tenant Family.

(L) The Tenant may terminate this Lease without cause at any time after the first year of the term of the Lease, on not more than sixty days written notice by the Tenant to Landlord (with copy to CCH). (The provisions of this subsection (L) are not intended to limit any right of the Tenant to terminate the Lease where so provided elsewhere in the Lease.)

(M) ~~This Lease has been signed by the parties on the condition that CCH will promptly execute a Housing Voucher Contract with the Landlord. This Lease shall not become effective unless CCH has executed a Housing Voucher Contract with the Landlord, effective the first day of the term of the Lease.~~

(N) Prohibited Lease Provisions

Notwithstanding anything to the contrary contained in the Lease, any provision of the Lease, which falls within the classification below shall be inapplicable.

(1) Confession of judgement. Prior consent by the Tenant to be sued to admit guilt, or in a judgment in favor of the Landlord in a lawsuit brought in connection with the Lease.

(2) Seize or Hold Property for Rent or Other Charges. Authorization to the Landlord to take property of the Tenant, or hold property of the Tenant, as a pledge or security until the Tenant meets any obligation which the Landlord has determined the Tenant has failed to perform.

(3) Exculpatory Clause. Agreement by the Tenant not to hold the Landlord or Landlord's agents legally responsible for any action or failure to act, whether intentional or negligent.

(4) Waiver of Legal Notice. Agreement by the Tenant that the Landlord may institute a lawsuit without notice to the Tenant.

(5) Waiver of Legal Proceedings. Agreement by the Tenant that the Landlord may evict the Tenant or hold or sell the possessions of the Tenant Family if the Landlord determines that the Tenant has violated the Lease, without notice to the Tenant or any court decision on the rights of the parties.

(6) Waiver of Jury Trial. Authorization to the Landlord to waive the Tenant's right the trial by jury.

     (7) Waiver of Right to Appeal Court Decision. Authorization to the Landlord to waive the Tenant's right to appeal a decision on the ground of judicial error or to waive the Tenant's right to sue to prevent a judgement from being put into effect.

(8) Tenant Chargeable with Cost of Legal Actions Regardless of Outcome of Lawsuit. Agreement by the Tenant to pay lawyer's fees or other legal costs whenever the Landlord decides to sue, whether or not the Tenant wins.

3. Dates of Payments

(A) The monthly rent is due and shall be paid the Landlord in advance on the fifth day of each month.

(B) If this Lease starts on a day other than the first day of month, the Tenant shall pay for the partial month a prorated share of the monthly rent, before occupancy of the premises may commence.

4. Landlord's Obligation

(A) Extermination services shall be provided by the Landlord as conditions may require. If such service is to be provided on a schedule basis, the schedule is as follows: (Specify, or state: "No Schedule"). As needed

(B) Repainting shall be provided by the Landlord as conditions may require. If such service is to be provided on a scheduled basis, the schedule is as follows: (Specify, or state: "No Schedule"). No schedule

(C) The Landlord shall in a reasonable time to calls by the Tenant for services or repair. Where applicable (as in the case of multi-unit buildings), maintenance with respect to common areas, facilities and equipment shall include painting, maintenance of lighting and equipment, maintenance of grounds, lawns and shrubs, and removal of snow and ice. Where security equipment and services are to be provided by the Landlord, they are as follows: (Specify, or state: "None"). Smoke / CO Detector

(D) Lawn maintenance and watering shall be provided by (insert Landlord or Tenant, as appropriate): Landlord

(E) Lawn maintenance equipment, such as mower, watering hoses, clippers, etc. shall be provided by (insert Landlord or Tenant, as appropriate): Landlord

(F) The Landlord shall not be liable for any interruption of services or utilities causes by reasons beyond his control, such as accident, repairs, alterations or improvements, strikes, lockouts, riots, or the failure of any public utility company to provide such services to the premises.

5.   Tenant's Obligations

(A)   The Tenant agrees to use the premises solely as the principal residence of the Tenant and the Tenant Family as identified in this Lease, and not to use or permit its use for any other purpose or to assign the Lease, sublease the premises, or provide accommodation for boarders or lodgers.

(B)   The Tenant shall observe all requirements and obligations imposed by this lease relating to the use of the building, and comply with any regulations now or hereafter posted on the premises, or delivered to the residence, when and if such become necessary for the safe and sanitary operation of building and the benefit and protection of all residents.

(C)   The Tenant shall use reasonable care to keep his dwelling unit in such condition as to prevent health or sanitary problems from arising.  The Tenant shall notify the Landlord promptly of known need for repairs to  his dwelling unit, and of known unsafe conditions which may lead to damage or injury.  Except for the normal wear and tear, the Tenant agrees to pay reasonable charges for repair of damages to the premises, development, buildings, facilities, or common areas caused by the Tenant, the Tenant Family, or persons who are on the premises with his consent.

(D)   By completing and signing the attached Condition and/or Inventory Report, the Tenant acknowledges the condition of the unit at the time of occupancy.

(E)   The Tenant agrees not to permit or commit any objectionable or disorderly conduct, noise or nuisance whatever about the premises by him, the Tenant Family, or persons who are on the premises with his consent, which noise or conduct will affect other residents' peaceful enjoyment of their premises.

(F)   The Tenant will not bring to the premises any item of furniture which, in Landlord's sole discretion, will or may cause an overloading to the structure of the building.  This will include, but shall not be limited to, waterbeds, safes, file cabinets and other heavy items.

(G)   The Tenant agrees not to make any alterations or additions on or about said premises without first obtaining the written consent of the Landlord.  The Tenant agrees not to place any additional lock, or change locks, upon any doors of the premises without the prior written consent of the Landlord, and without giving the Landlord a key to any such locks.

(H)   The Tenant agrees to allow the Landlord to enter his unit at any reasonable time to inspect, repair and/or maintain said premises, even through the Tenant may not be personally-present.  Except in the case of an emergency, the Landlord shall give the Tenant written notice of any proposed entry no later than the last business day before said entry.

(I)   The Tenant agrees that if the Tenant, the Tenant Family, or any person on the premises with his consent, shall use the laundry room, storage room,, or any other facilities inside or outside the demised premises, such person  does so at his own risk.

(J)   The Tenant shall not keep any dogs, cats, or pets or animals on the premises.

6. Termination Notices

A. The Tenant may terminate this Lease without cause at any time after the first year of the terms of the Lease. The Tenant shall give at least thirty days written notice of such termination to the Landlord and send a copy of said notice to CCH.

B. ~~If the Landlord terminates this Lease for "other good cause" as that term is used in Section 2, Subsection (H) (1) (iii) and (H) (2), the Landlord shall give the Tenant at least ten days written notice and such termination shall be effective only at the end of the month. The Landlord shall send a copy of such notice to CCH. The notice must state the reason for the termination and the date on which the termination will be effective. For the purpose of determining the length of any termination notice required by State or local law, this Lease shall be considered to be month-to-month tenancy.~~

Signatures:

Tenant

By: [signature] 11/09/09

Signature date

Burton Sandles

print or type name of family representative

By:____________________

Signature date

____________________

print or type name of family representative

Landlord Vida LLC

Print or type name of Owner/Landlord

By: T. Schuh 11/16/09

Signature date

Tiana Schuh controller

print or type name and title of signatory



COLORADO
COALITION
FOR THE
Homeless

March 3, 2010

Burt Sandles #
c/o Denver County Jail
10500 East Smith Road
Denver, CO 80239

Dear Mr. Sandles,

This letter is to officially notify you that your SHP Voucher has been cancelled due to the following reason:

You are incarcerated, and have been so for over 30 days. HUD guidelines state that once someone has been out of their unit for over 30 days, they lose their housing voucher.

This termination does not affect your continuing participation in the case management and services portions of the program. You can reapply for a housing voucher with the program in the future, and your application will be reviewed in light of your situation at that time. You will be asked to provide a plan to prevent the above situations from reoccurring.

You have the right to appeal this decision by contacting the Housing Services at 1211 Champa Street, Denver CO, 80205. The appeal must be received within ten business days of the date of this letter.

Sincerely,

EHardy LCSW

Elissa Hardy, LCSW
Program Manager
16th Street Housing First
(720) 404-9882

SOCIAL SECURITY ADMINISTRATION

TOE 710

Form Approved
OMB No. 0960-0622

## REQUEST FOR RECONSIDERATION

(Do not write in this space)

| NAME OF CLAIMANT | | NAME OF WAGE EARNER OR SELF-EMPLOYED PERSON (If different from claimant.) |
|---|---|---|
| Burton Sandles | | |
| CLAIMANT SSN | CLAIMANT CLAIM NUMBER (if different from SSN) | SUPPLEMENTAL SECURITY INCOME (SSI) OR SPECIAL VETERANS BENEFITS (SVB) CLAIM NUMBER |
| 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 | 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 DI | - - |
| SPOUSE'S NAME (Complete ONLY in SSI cases) | | SPOUSE'S SOCIAL SECURITY NUMBER (Complete ONLY in SSI cases) |
| Divorced | | - - |

CLAIM FOR (Specify type, e.g., retirement, disability, hospital /medical, SSI, SVB, etc.)
SSI

I do not agree with the determination made on the above claim and request reconsideration. My reasons are:
I believe the extraction is excessive.

SUPPLEMENTAL SECURITY INCOME OR SPECIAL VETERANS BENEFITS RECONSIDERATION ONLY
(See the three ways to appeal in the How To Appeal Your Supplemental Security Income (SSI) Or Special Veterans Benefit (SVB) Decision instructions.)
**"I want to appeal your decision about my claim for Supplemental Security Income (SSI) or Special Veterans Benefits (SVB). I've read about the three ways to appeal. I've checked the box below."**

☐ Case Review ☐ Informal Conference ☒ Formal Conference

EITHER THE CLAIMANT OR REPRESENTATIVE SHOULD SIGN - ENTER ADDRESSES FOR BOTH

**I declare under penalty of perjury that I have examined all the information on this form, and on any accompanying statements or forms, and it is true and correct to the best of my knowledge.**

| CLAIMANT SIGNATURE | | | SIGNATURE OR NAME OF CLAIMANT'S REPRESENTATIVE ☐ NON-ATTORNEY ☐ ATTORNEY | | |
|---|---|---|---|---|---|
| Nelson B. Kincaid for Burton Sandles | | | | | |
| MAILING ADDRESS 25 E 16th Ave #4 | | | MAILING ADDRESS | | |
| CITY Denver | STATE Co | ZIP CODE 80202 | CITY | STATE | ZIP CODE - |
| TELEPHONE NUMBER (Include area code) (720) 628-2796 | | DATE 2/10/11 | TELEPHONE NUMBER (Include area code) ( ) - | | DATE |

**TO BE COMPLETED BY SOCIAL SECURITY ADMINISTRATION**

See list of initial determinations

1. HAS INITIAL DETERMINATION BEEN MADE? ☐ YES ☐ NO
2. CLAIMANT INSISTS ON FILING ☐ YES ☐ NO
3. IS THIS REQUEST FILED TIMELY? ☐ YES ☐ NO
*(If "NO", attach claimant's explanation for delay and attach any pertinent letter, material, or information in Social Security office.)*

RETIREMENT AND SURVIVORS RECONSIDERATIONS ONLY (CHECK ONE) REFER TO (GN 03102.125)

☐ NO FURTHER DEVELOPMENT REQUIRED (GN 03102.300)
☐ REQUIRED DEVELOPMENT ATTACHED
☐ REQUIRED DEVELOPMENT PENDING, WILL FORWARD OR ADVISE STATUS WITHIN 30 DAYS

SOCIAL SECURITY OFFICE ADDRESS

ROUTING INSTRUCTIONS (CHECK ONE)

☐ DISABILITY DETERMINATION SERVICES *(ROUTE WITH DISABILITY FOLDER)*
☐ ODO, BALTIMORE
☐ PROGRAM SERVICE CENTER
☐ OIO, BALTIMORE
☐ OEO, BALTIMORE
☐ DISTRICT OFFICE RECONSIDERATION
☐ CENTRAL PROCESSING SITE (SVB)

**NOTE:** Take or mail the **signed original** to your local Social Security office, the Veterans Affairs Regional Office in Manila or any U.S. Foreign Service post and keep a copy for your records.



UNITED STATES COMMISSION ON CIVIL RIGHTS

Rocky Mountain Regional Office 303-866-1040
999 – 18TH Street, Suite 1380, South Tower, Denver, CO 80202 Fax 303-866-1050

July 19, 2011

Burton Sandles
1746 Emerson Street, #103
Denver, CO 80218

Dear Mr. Sandles:

This letter is in response to your telephone call regarding your need for a civil rights attorney.

To explain in more detail, the U.S. Commission on Civil rights is a research and advisory body which has no enforcement powers and does not directly investigate or resolve individual complaints of discrimination. In addition, we are unable to provide legal advice, representation, or refer you to an attorney.

However, I am providing you in writing the name of a community organization that sponsors free legal night once per month from 5:30 p.m. – 7:00 p.m., first come first served (I left you this information on your answering machine):

Mi Casa Resource Center
360 Acoma Street, Denver, CO 80223
303-573-1302

Dates for Legal night are the third Tuesday of the month: July 19, August 16, September 20, October 18, November 15, and December 20.

As I promised, I am enclosing the handbook, *Getting Uncle Sam to Enforce Your Civil Rights,* which might be a useful resource to you.

Thank you for contacting our agency. We regret that we are unable to provide you with direct assistance.

Sincerely,

MALEE V. CRAFT
Regional Director

Enclosure